# Illinois Official Reports

## Appellate Court

---

*People v. Smith*, 2021 IL App (1st) 190421

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RASHAWN SMITH, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>No. 1-19-0421 |
| Filed | June 30, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-CR-17662; the Hon. Joseph M. Claps and the Hon. Ursula Walowski, Judges, presiding. |
| Judgment | Affirmed in part and vacated in part; cause remanded. |
| Counsel on Appeal | DePaul University Legal Clinic, of Chicago (Gilbert C. Lenz, of counsel (Heidi E. Hornemann and Sydney Warda, law students)), for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Aline B. Dias, Assistant State's Attorneys, of counsel), for the People. |

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Justices Reyes and Martin concurred in the judgment and opinion.

## OPINION

¶ 1 On December 7, 2016, defendant Rashawn Smith was arraigned before the Honorable Joseph M. Claps in both this matter and in Cook County case number 16 CR 17661.[1] Defendant was subsequently charged by indictment with six offenses that were alleged to have been committed on October 26, 2016, by "Rashawn Smith also known as Rashawn T Smith." Count I of the indictment charged defendant with being an armed habitual criminal as a Class X felony (720 ILCS 5/24-1.7 (West 2016)). Count II of the indictment charged defendant with possession of a stolen motor vehicle as a Class 2 felony (625 ILCS 5/4-103(a)(1), (b) (West 2016)). Count III of the indictment charged defendant with unlawful use or possession of a weapon by a felon as a Class 2 felony (720 ILCS 5/24-1.1(a), (e) (West 2016)). Count IV of the indictment charged defendant with unlawful use or possession of a weapon by a felon as a Class 2 felony (*id.*). Count V of the indictment charged defendant with aggravated unlawful use of a weapon as a Class 2 felony (*id.* § 24-1.6(a)(1), (3)(A-5)). Count VI of the indictment charged defendant with aggravated unlawful use of a weapon as a Class 2 felony (*id.* § 24-1.6(a)(1), (3)(C)).

¶ 2 The State nol-prossed count II and proceeded on the remaining counts. Following a bench trial, the trial court convicted defendant on counts I, III, and IV and acquitted him on counts V and VI. Defendant was subsequently sentenced to 10 years' imprisonment in the Illinois Department of Corrections on count I. Judgment on counts III and IV was merged into count I.

¶ 3 On appeal, defendant alleges that (1) the State failed to establish his guilt of being an armed habitual criminal and unlawful use or possession of a weapon by a felon beyond a reasonable doubt where insufficient evidence proved that defendant was the same individual named in the certified statements of conviction that were admitted in evidence, (2) the State failed to establish defendant's guilt on the armed habitual criminal conviction where one of his prior convictions was for an offense committed when he was a minor, (3) the posttrial judge failed to conduct a proper inquiry into defendant's posttrial allegation of ineffective assistance of counsel, and (4) defendant's 10-year sentence is excessive.

¶ 4 For the reasons that follow, we reverse defendant's armed habitual criminal conviction under count I, affirm his unlawful use or possession of a weapon by a felon convictions under counts III and IV, and remand for resentencing on count III and count IV. Based on our disposition of this matter, we need not address defendant's alternative argument for reversing his armed habitual criminal conviction raised in issue 2 of his brief or his excessive sentence claim raised in issue 4 of his brief. We do, however, consider defendant's claim that the posttrial judge failed to conduct an inquiry into his claim of ineffective assistance of counsel

---

[1]The State nol-prossed the charges in case number 16 CR 17661 on April 4, 2019, after the victim in that case died.

raised in issue 3 of his brief and hold that the posttrial court's inquiry was sufficient.

I. BACKGROUND

On October 27, 2017, defendant was tried before the Honorable Judge Joseph Claps. The indictment in this matter alleged that multiple offenses were committed on October 26, 2016, by "Rashawn Smith also known as Rashawn T Smith."[2] As relevant to the issues raised in this appeal, count I charged that defendant knowingly possessed a firearm after having been convicted of manufacture or delivery of a controlled substance under case number 13 CR 1314201 and manufacture or delivery of a controlled substance under case number 11 CR 520001. Count III charged that defendant knowingly possessed a firearm after having been previously convicted of manufacture or delivery of a controlled substance under case number 13 CR 1314201 and that defendant was on parole or mandatory supervised release at the time of the offense. Count IV charged that defendant knowingly possessed firearm ammunition after having been previously convicted of manufacture or delivery of a controlled substance under case number 13 CR 1314201 and that defendant was on parole or mandatory supervised release at the time of the offense.

Defendant's bench trial commenced on October 27, 2017. Officer Daniel Echeverria testified that on October 26, 2016, at 7:30 a.m., he was assigned to follow up on an armed robbery investigative alert and drove with his partners, Officer Stan Figus and Officer Garcia,[3] to 4448 West Carroll Avenue, where the officers prepared to set up surveillance for the address of 4447 West Carroll Avenue. Officer Echeverria saw the Nissan Sentra that was the subject of the investigative alert parked at 4448 West Carroll Avenue. The vehicle was occupied by a single individual who would later be identified in court as defendant.

After Officer Echevarria called for assistance, he observed defendant exit the driver's side of the vehicle and attempt to enter a multiunit apartment building located at 4447 West Carroll Avenue. Officer Echevarria observed defendant open the common entrance front door and toss car keys into the vestibule. Defendant was subsequently arrested.

Officer Echevarria recovered the car keys from the vestibule and gave them to evidence technician (ET) Armando Alonso. In the process of watching ET Alonso open the car and begin processing it, Officer Echevarria observed a black pistol with a laser sight on the front driver's side floorboard. The gun, which was visible from the driver's side of the car, was a Springfield Armory .45-caliber, semiautomatic pistol and was loaded with 11 live rounds. When Officer Echevarria informed ET Alonso that he observed a gun on the driver's side floorboard, ET Alonso recovered and inventoried the gun.

Later that day, defendant was Mirandized at the police station (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and interviewed by Detective Kenneth Baker. Defendant admitted that the firearm recovered from the Nissan Sentra was his, that he paid $700 for it, and that he purchased it for "personal security purposes." He further admitted that it was loaded with ammunition. During the interview, defendant also told Detective Baker that he was discharged from the Department of Corrections on May 3, 2016, after serving a three-year sentence for a

---

[2]The caption of the State's brief erroneously refers to defendant as "Rashawn T. Smith," where the only reference to this name is found in the alias contained in the indictment in this matter. No other document in the record on appeal identifies defendant as "Rashawn T. Smith."

[3]No first name appears for Officer Garcia in the record on appeal.

drug charge and that he was currently on parole. This interview was electronically recorded, admitted in evidence without objection, impounded by the trial court, and is part of the record on appeal.

¶ 11    The State then offered "a certified statement of conviction for case number 11 CR 0520001, indicating the defendant, Rashawn Smith, has been convicted of the offense of manufacture and delivery of [a] controlled substance." When the court asked whether the conviction was for manufacture or delivery, the State replied, "It would be delivery of controlled substance." The State then offered "a certified statement of conviction for case number 13 CR 13142, indicating the defendant, Rashawn Smith, has been convicted of the offense of delivery of [a] controlled substance."

¶ 12    The following then transpired:

"THE COURT: Okay. That's a stipulation then?

[ASSISTANT PUBLIC DEFENDER (APD)] NIXON: No, your Honor.

THE COURT: Sorry?

APD NIXON:We're not stipulating. I do acknowledge that it is a self authenticating document.

THE COURT: He started off as a stipulation. Didn't you say that word?

[ASSISTANT STATE'S ATTORNEY (ASA)] KLEIST: No, your Honor.

THE COURT: Let me see them. You are offering the certified convictions?

ASA KLEIST: Yes.

THE COURT: Okay. You are agreeing these are certified convictions of somebody named Rashawn Smith. You are not agreeing that it is your Rashawn Smith.

APD NIXON: Yes, your Honor.

THE COURT: Okay. Go ahead.

ASA SACK: At this time we'd ask for a continuance date. We're not prepared to rest.

THE COURT: Okay.

ASA SACK: We're not prepared to rest at this time.

THE COURT: Okay. What date then?

ASA KLEIST: If we could have November 16th, your Honor.

THE COURT: Okay. Trial commenced and continued until that day."

¶ 13    On November 16, 2017, the following transpired:

"ASA KLEIST: Your Honor, the [S]tate is not going to be answering ready today. In order to put on two witnesses we need a transcript. I have one of those transcripts, I do not have the second. I'm asking for a continuance to obtain the second transcript."

¶ 14    The court granted the State's motion and continued the case to November 28, 2017. On November 28, 2017, the State said that it was still trying to track down the transcript. The following transpired:

"ASA KLEIST: This is a commenced and continued trial. We're still in the State's case in chief. The State needs two transcripts. One of them I have obtained. The second one I have not obtained. I've reached out to the court reporter's office. That court reporter has since retired, and that may be delaying the receiving of that transcript.

THE COURT: Okay. So are you reaching out to the retired court reporter?

ASA KLEIST: Yes. I'm asking for December 5th, your Honor.

THE COURT: December what?

ASA KLEIST: Yes.

THE COURT: Let me ask you this question.

ASA KLEIST: Yes, your Honor.

THE COURT: Not you. You.

APD NIXON: Yes, your Honor.

THE COURT: I understand that you were requested to stipulate to the admission of the certified copy of prior conviction as it applies to the felony possession of a firearm by—or unlawful use or possession of a weapon by a felon. Right?

APD NIXON: Yes. Well. your Honor, I believe that's also an element to the armed habitual criminal.

THE COURT: And the armed habitual criminal, those two charges.

APD NIXON: Right. Yes.

THE COURT: So I understand that you're entitled to not stipulate. My question, are you objecting to the admission of the State's document?

APD NIXON: No.

THE COURT: Because those are apples and oranges.

APD NIXON: No. And that's correct. No. I am not objecting to the admission of the document.

Your Honor, I understand the State is asking for December 5th. In the interim, I'm asking if my client could be released on electronic monitoring pending the continuation of his trial.

THE COURT: Okay. That's not going to happen.

The other thing that has to be resolved at some point is whether—I don't think this is—it's not waivable, you could stipulate that if a person is called to testify, they would testify, but if there's—I have not decided as to whether or not the admission of that certified copy is a violation. That has to be resolved.

APD NIXON: Yes, your Honor.

THE COURT: So both sides think about that because that's an issue in my mind."

¶ 15    On December 5, 2017, the court continued the matter to the following day to complete its research. On December 6, 2017, the following transpired:

"APD NIXON: This is a commenced and continued trial.

THE COURT: Are you ready?

ASA KLEIST: Yes.

APD NIXON: This is for the State to—

ASA KLEIST: The last thing the State did, I believe I introduced the certified convictions into evidence. There was no—

APD NIXON: There was no stipulation that the information was my client.

ASA KLEIST: Your Honor, those certified convictions, are they in the court file?

- 5 -

THE COURT: I have no idea. So you're going to enter the certified convictions. Then what?

ASA KLEIST: State would rest.

THE COURT: With the certified convictions State rests.

APD NIXON: Your Honor, with that I have a motion for directed finding.

THE COURT: Do you want to argue?

APD NIXON: No, your Honor.

THE COURT: Motion for directed finding, denied."

¶ 16    The defendant then rested without presenting any evidence.

¶ 17    The State waived its initial closing argument. In her closing argument, APD Nixon argued, among other things, that the State failed to prove an element of the offenses charged in count I, count III, and count IV, namely that defendant was the same individual named in the certified statements of conviction in case number 13 CR 1314201 and case number 11 CR 520001. APD Nixon noted that the State failed to present any evidence establishing defendant's Identification Record (IR) number or date of birth as well as any testimony identifying defendant by name.

¶ 18    In responding to defendant's claim, the State alleged that it had proven the elements of being an armed habitual criminal and argued:

"ASA: Regarding the defendant's prior convictions, there was—those certified convictions. [B]oth certified convictions have the defendant's name on them. There was no objection from counsel regarding the introduction to those certified convictions. The production of the certified convictions is the traditional way in which the State proves prior convictions. They are certified by the clerk of the court. The names on those convictions is the same name that's in the charging document. That is the defendant's name."

¶ 19    The court then made the following findings of fact:

"THE COURT: I've heard the arguments, observed the evidence. In terms of Count 1, State has an obligation to establish, amongst other things, prior convictions. For that, the State entered into evidence certified statement of conviction for a Rashawn Smith under case No. 13 CR 13142-01 and a Rashawn, middle initial, T as in Tom, Smith under 11 CR 05200-01. Rashawn Smith is charged in the charging document under the name Rashawn Smith and aka Rashawn T. Smith. In addition to the certified copies of conviction, it's a matter of public record that these case numbers in the computer system operated by Dorothy Brown, the Clerk of the Circuit Court, lists the IR No. 1705347 under both of these prior convictions for Mr. Smith, which is the IR number associated with the current case. I believe the State has demonstrated beyond a reasonable doubt the elements of the offense of armed habitual criminal, the felony possession of a firearm and felony possession of ammunition. The previous conviction as to Counts 5 and 6, the evidence falls short. There is a finding of not guilty as to Counts 5 and 6. Judgment is entered on Counts 1, 3 and 4. Bond is revoked."

¶ 20    Defendant filed a posttrial motion renewing his claim that the State failed to establish that he was the individual named in the certified statements of conviction where (1) no State witness ever identified him by name, (2) no evidence was presented as to his date of birth, and (3) no evidence was produced to establish his IR number.

¶ 21    In response to defendant's posttrial motion, the State argued:

"ASA KLEIST: Regarding the prior felony convictions, your Honor was given two certified convictions. One of those at least has the name Rashawn Smith; the second one, Rashawn T. Smith. The charging documents that are in front of your Honor give the name Rashawn AKA—excuse me—give Rashawn Smith, AKA Rashawn T. Smith. I believe that is sufficient to establish that the certified convictions without any, without any objection, the individual convicted in those certified convictions is the same person that was on trial and your Honor sees in court today. So I believe we have established that as well."

¶ 22 The following exchange then transpired:

"THE COURT: Wouldn't having the IR number and or birthdate help in the identifications?

ASA KLEIST: Yes. your Honor.

THE COURT: They would have helped the complaint that no one identified this man standing in front of me as Rashawn Smith. What about that?

ASA KLEIST: One moment. your Honor.

(Short pause.)

THE COURT: You got an answer?

ASA KLEIST: Your Honor. I don't.

THE COURT: Okay."

¶ 23 On January 26, 2018, the court denied defendant's posttrial motion and commenced a sentencing hearing. APD Nixon corrected an error in the presentence investigation report. The State indicated that defendant was subject to a Class X sentence based on having two prior Class 1 felonies and a prior Class 3 felony in his background.

¶ 24 In mitigation, APD Nixon indicated that defendant had a six-month-old child who was born while defendant was in custody, that defendant completed the tenth grade after growing up on the west side of Chicago, and that defendant was a lifelong resident of the Chicagoland area.

¶ 25 The court sentenced defendant to 10 years' imprisonment in the Illinois Department of Corrections but declined to enter judgment on the sentence when defendant challenged the classification of his prior convictions. A lengthy discussion followed wherein the State admitted that it had erred when it indicated that defendant's conviction in case number 13 CR 1314201 was for a Class 1 felony, stating that the conviction in that case was actually a Class 2 felony.[4] APD Nixon indicated that a Federal Bureau of Investigation sheet indicated that the charge in case number 13 CR 1314201 was amended to a Class 4 felony but also showed the presence of a Class 2 felony. At this point, the court decided to order the court file from 13 CR 1314201 so that this matter could be resolved.

---

[4]As our prior Rule 23 order in this matter makes clear, defendant was initially sentenced to concurrent prison terms of nine years and seven years in the Illinois Department of Corrections for a Class 1 of possession of a controlled substance with intent to deliver and a Class 2 delivery of a controlled substance, respectively. *People v. Smith*, 2016 IL App (1st) 140053-U, ¶ 2. In response to defendant's motion to reconsider, the trial court reduced defendant's sentence to concurrent six-year prison terms. *Id.* On appeal, we found that defendant's concurrent six-year sentences were not excessive and stood as separate convictions where they did not violate one-act, one-crime principles. *Id.* ¶¶ 21-22.

¶ 26    On February 16, 2018, APD Nixon indicated that defendant's 2013 conviction appeared to be based on a guilty plea to a Class 1 charge. On that same date, APD Nixon informed the court that defendant wished to hire a private attorney to represent him.

¶ 27    Privately retained counsel, attorney Peter Lewis, filed an appearance on April 6, 2018, and the parties discussed the status of defendant's prior conviction in case number 13 CR 1314201. The court now noted that defendant was convicted of both a Class 1 and a Class 2 felony in that case, that there had been an appeal in this matter, and that, after originally receiving a seven-year sentence, defendant's sentence was reduced to six years' imprisonment.

¶ 28    On May 10, 2018, the court indicated that defendant's 2011 conviction in case number 11 CR 0520001 was for a Class 1 possession of a controlled substance with intent to deliver. As such, the court determined that defendant was properly subject to a mandatory Class X sentence based on possessing two prior Class 1 convictions.

¶ 29    On May 17, 2018. Mr. Lewis filed a motion to withdraw as counsel, but on May 23, 2018, he informed the court that defendant had assured him that defendant's family would make proper arrangements to retain counsel, and he requested a continuance to June 1, 2018.

¶ 30    On June 1, 2018. Mr. Lewis informed the court that he was unable to reach an agreement with defendant's family and sought leave to withdraw as counsel. The court granted Mr. Lewis's motion and asked defendant whether he was going to retain a new attorney or whether he was requesting "*pro bono*" counsel. Defendant replied that he wanted to ask the court questions "[r]egarding the armed habitual, things like that." The trial judge told defendant that he could not answer any questions until the question of who was going to represent him was decided. Defendant stated, "the plan is to get a new lawyer."

¶ 31    The following colloquy then transpired between Mr. Lewis and the trial court:

"MR. LEWIS: For the record. I do believe that the defendant believes he has a good faith basis for some of his claims and he does believe that they do have merit. And I think he would benefit from another public defender or another attorney reviewing some of his case and information.

THE COURT: As it applied to what, the armed habitual?

MR. LEWIS: I believe so.

THE COURT: Because?

MR. LEWIS: Well. he—I mean, just on my limited information. I believe that he thinks there is some discrepancies as to some of his prior classifications of his convictions as it applies to the current case.

THE COURT: I got this conviction so we will see."

¶ 32    On June 28, 2018, Judge Claps again addressed defendant:

"THE COURT: You told me you were going to hire a lawyer.

DEFENDANT: I thought you said you was going to hire a *pro bono*.

THE COURT: I said that?

THE DEFENDANT: That's what I was coming back for because I told you what happened with my mama and my daddy, they passed away last month. This was a lot of things going on so I thought…

THE COURT: Let me see his file. This don't say that to me. That's what you want me to try to do is find a *pro bono* attorney?

DEFENDANT: I would appreciate, your Honor.

THE COURT: I'll try. 7/30.

DEFENDANT: Thank you."

¶ 33    On July 30, 2018, this matter appeared before the Honorable Ursula Walowski. Defendant informed Judge Walowski that Judge Claps had told him that a *pro bono* attorney would be hired to represent him. Judge Walowski told defendant that he needed to either hire counsel or be represented by the Office of the Public Defender. At this point APD Michael Biel informed the court that he was in possession of notes supporting defendant's expressed belief that Judge Claps was going to find defendant a possible attorney or assist him in seeking a *pro bono* attorney. The court then told defendant that it would look into the matter because the court was of the opinion that the Office of the Public Defender should have been reappointed.

¶ 34    Judge Walowski then granted defendant's motion for a continuance to contact a *pro bono* attorney through the Chicago Bar Association. After the defendant left the courtroom, however, he requested that his case be recalled and was brought back before the court.

¶ 35    Defendant requested the appointment of an assistant public defender, and APD Biel addressed the court:

"APD BIEL: Judge, I did speak to Mr. Smith in the back. I understand that him and Ms. Nixon, his trial attorney, have had a falling out.

What I can promise to do is raise the issue with supervisors. Whether or not Mr. Smith is actually appointed a different public defender at this juncture, I cannot say for sure one way or the other. But I will certainly raise the issue."

¶ 36    Judge Walowski then informed defendant that she was willing to reappoint the Office of the Public Defender to represent him but that defendant would not be able to select an assistant public defender of his choosing. The court noted that it would make sense for APD Nixon to be reappointed but that the Office of the Public Defender would decide whether to appoint new counsel. The court agreed to appoint the Office of the Public Defender, "and then we'll see what happens, okay?"

¶ 37    The following exchange then transpired:

"DEFENDANT: All right. Because, yeah, I had her—wrote a grievance on her with ARDC, so it was a lot of things that she didn't do in my trial that should have been done.

THE COURT: Well then, that's something that—Like I said, she'll be—but he's got to—Mr. Biel is right. He's got to check with his supervisors to see what they can do, okay?

DEFENDANT: Okay.

THE COURT: But in the meantime I will tell you that there is no such thing as far as a judge finding you a lawyer. It's—A judge can tell you to—

DEFENDANT: I don't know why Claps said that then. I don't know why he said that.

THE COURT: Okay. I don't know that he said that. I'm sure he said—

DEFENDANT: I will find you *pro bono*. That's exactly what he said.

THE COURT: Well, you can go on—Like I said, the Chicago Bar Association, that's a big lawyer's group that you could go on their website, call them and ask for a

referral. That's where you would go to try and find a lawyer who would represent you *pro bono*. So it's on you to do that. I mean. I could just let you know about these bar associations. One of them, like I said, is called the Chicago Bar Association.

DEFENDANT: Oh. .com.

THE COURT: Yeah. Just look it up. Chicago Bar Association. It's a lawyer group. Okay. You look them up and I'm sure there's a referral line and you could call them and see what—you know, if they could direct you somewhere to a lawyer that would possibly take your case *pro bono*, okay? So you could do that in the meantime as well. So your date is going to stay the same. The Public Defender's Office is appointed.

MR. BIEL: What was the date. Judge?

DEFENDANT: The 24th.

MR. BIEL: Judge, has an actual motion for a new trial been filed?

ASA KLEIST: It has been filed and denied.

MR. BIEL: Oh, it's already been denied. And when—Was that with the private attorney or was that with Ms. Nixon?

THE COURT: No. I don't—Does it show that? Because I don't that.

MR. KLEIST: I wrote that it was denied on January 26th.

DEFENDANT: I'm going for a new one.

THE COURT: Okay. Yeah. it does say that. Okay.

MR. BIEL: Well. I mean, then we are now in the—

DEFENDANT: No.

THE COURT: No. he already got sentenced. That's why I'm not even sure why—This is like a postconviction.

MR. BIEL: He already got sentenced?

DEFENDANT: I never got sentenced.

ASA KLEIST: He—Your Honor, during the course of the actual sentencing, the defendant made allegations that he did not believe he was Class X by background. And that's why the Court took a continuance, ordered his prior two files, which are the ones that are attached to this one to confirm his criminal background which was subsequently confirmed by everyone that he is, in fact, X by background. And then after that the defendant then indicated to the judge that he wanted a private attorney to file some motions—

THE COURT: So he was never sentenced.

MR. KLEIST: He has never actually been sentenced.

THE COURT: So he has to be sentenced.

MR. BIEL: Well then. I think Mr. Smith if the Court can explain to Mr. Smith, he is no longer in the motion phase of his case. He is now in a sentencing phase of his case.

DEFENDANT: Well—sentencing phase of this case.

MR. BIEL: So any public defender that comes on now would be strictly for the purposes of a sentencing hearing.

DEFENDANT: Well no.

THE COURT: Well yeah. Mr. Smith. Well, yes and no. I mean, you can always try to ask to reopen a motion for a new trial.

DEFENDANT: Yes.

THE COURT: In the event that there's something that's not there that you want to—

DEFENDANT: Because that's what me and Claps was going to do.

THE COURT: Okay. So, Mr. Biel, just—why don't you take a look into the case, talk to Mr. Smith. See what, if any, issues he may want raised before sentencing. We can address that on the next court date. But Mr. Smith—

DEFENDANT: A lot of issues, your Honor.

THE COURT: Okay. Well. There's some—you know, you could take a look at what was raised before. So. Mr. Smith—But in the meantime you could also look into the Chicago Bar Association, okay?

DEFENDANT: Yeah. I think I'm going to do that too because I don't understand—

MR. BIEL: Judge, I don't know if there are filing times at issue, but just in case, I'm asking the Court to extend any potential filing times that may be of record.

THE COURT: Yes. Okay. All right, Mr. Smith, August 24th.

DEFENDANT: May I say one thing. I would be able to file the motion in front of you or—

THE COURT: Well, in this courtroom, yeah, whoever is sitting here.

DEFENDANT: That's exactly what I want to do.

THE COURT: Okay.

DEFENDANT: All right. I appreciate it."

¶ 38    On August 24, 2018, when the matter was again before Judge Walowski, APD Nixon appeared on behalf of defendant. The following transpired:

"MS. NIXON: I believe your Honor reappointed my office on his last court date.

THE COURT: Right. Do you have a motion for new trial today?

MS. NIXON: The motion for new trial was already litigated.

THE COURT: This is for possible new motion for new trial. You were going to talk to him about whether there was anything that you are willing to file after speaking to him.

MS. NIXON: Yes. However—well, I can wait until he comes out.

THE COURT: Fine.

MS. NIXON: For the record Assistant Public Defender Takenya Nixon. Present to my left is the defendant. I did have a conversation with my client regarding the possible new motion to reconsider trial. This matter was already litigated, decided by Judge Claps. I have no new information to add to a motion for new trial. What I have done, we have gotten as far as I did order a copy of the transcript from the sentencing hearing. I have not received it yet.

THE COURT: We need that.

MR. KLEIST: I have it. January 26th this is.

MS. NIXON: Yes.

MR. KLEIST: I have it.

MS. NIXON: So, also, in ordering the transcript for the sentencing hearing on the 15th, I also ordered a transcript from the sentencing on another matter that Mr. Submit [*sic*] indicated he was not—that that particular charge was not a class two, a drug charge. The Judge had ordered the file. I went ahead and ordered the transcript, just to be on the safe side. I haven't received that either.

THE COURT: Is there a question as to a prior conviction?

MS. NIXON: Yes.

THE COURT: Which conviction?

DEFENDANT: Your Honor—

THE COURT: Hold on. Mr. Smith.

DEFENDANT: I'm sorry.

MR. KLEIST: The 13 CR matter was a class four.

THE COURT: Okay.

MR. KLEIST: And not a class one. So, I will say we have both court files here from the defendant's two prior convictions.

THE COURT: I don't see convictions in the PSI. I have one where he got six years. That was what kind of case?

MR. KLEIST: Class one, manufacture and delivery.

THE COURT: Class one. The 13 CR.

MR. KLEIST: Class one.

THE COURT: You verified that is a class one?

MR. KLEIST: Yes.

THE COURT: Miss Nixon, did you verify that?

MS. NIXON: Yes, I did.

THE COURT: That was a class one?

MS. NIXON: Yes.

THE COURT: Okay. The other conviction is 11 CR 158. Class three. Is that correct?

MS. NIXON: Yes. That is not one of the convictions the State was using for the armed habitual. So, Mr. Smith—

THE COURT: Okay. Then I have another conviction, 11 CR 05200. What is that?

MR. KLEIST: Class one.

THE COURT: Two prior class ones then he has?

MR. KLEIST: Correct.

THE COURT: He was found guilty. What's next?

APD NIXON: Your Honor, what I did was order the transcripts for the 11 CR 0520001. While I did verify with the court file that matter was a class one, my client vehemently denies pleading to a class one, so I want to get a copy of the transcript in order to see what was told to him in court to ensure that it was a class one.

THE COURT: Okay. Mr. Smith is saying he did not [plead] guilty to a class one, but the records reflect it is a class one.

MS. NIXON: The court file records do reflect.

THE COURT: That's the bone of contention here, is that right?

MS. NIXON: Yes, your Honor.

THE COURT: Okay.

MS. NIXON: That's a transcript that I have ordered but I haven't received it yet. I'd be requesting a date. I know Mr. Smith wanted to say something to your Honor. I did advise him that anything he says to your Honor is against my advice.

THE COURT: Go ahead.

DEFENDANT: I was trying to understand like about this whole armed habitual thing. I'm not a violent person. This is my first possession of firearm. I've been fighting this case since 2016, for 22 months now.

THE COURT: Mr. Smith, I don't know what you don't understand. The State charges you with a charge. The State charges you with armed habitual criminal. You know, the sound of that charge may sound like something, but basically what they have to prove is that you possessed a firearm and you have two prior convictions. Based on the certified copies of conviction they proved you have two prior convictions for class one felonies. Even though they are drug cases, they are class ones. You possessed a firearm. It looks like this was a bench.

MS. NIXON: It was.

THE COURT: Judge Claps found you guilty of possessing a firearm and having the prior two convictions. That's what you are convicted of. That charge that you were found guilty of has a sentencing range, because he is a Class X, from six to thirty years, okay.

DEFENDANT: Okay. But, see, they went off an indictment—some indictment papers that she has presented to Judge Claps. They didn't supposed to charge me with armed habitual.

THE COURT: There is no such thing—

DEFENDANT: I don't know.

THE COURT: There is no such thing as not supposed to charge you with something. The State has to prove you guilty beyond a reasonable doubt. That's what happened in this case, okay.

DEFENDANT: That's what I'm saying. They say it was a clerk got on the stand and all this to verify my charges. None of this happened in the trial.

MS. NIXON: There was an issue during the trial. I did not stipulate to the prior convictions. So, when I was talking to my client, the possible things that can happen, how the State can prove those prior convictions, that was one thing I mentioned. Not that the State would have to have done that.

THE COURT: You had certified copies of conviction?

MR. KLEIST: We did.

THE COURT: That's sufficient. A certified copy of conviction is sufficient for them to prove you were convicted of two prior felonies.

DEFENDANT: Even one is 11 and I was seventeen years old?

THE COURT: Yes. That's an adult conviction, yes. They can use that against you, yes.

DEFENDANT: I supposed to went to juvenile. They brought me straight to County though.

THE COURT: Yes. You are 17. That's an adult charge. It may not be fair or whatever to you, but yes. You got charged as a felony at 17, an adult felony. You pled guilty.

DEFENDANT: For probation. They tried to offer me a year. I don't understand how I took time to a class one.

THE COURT: Because you made decisions, you know, that now you regret. So, ready to proceed to sentencing today?

MS. NIXON: No. Because there is that question. His belief was it was a class four in 2011.

THE COURT: All right.

MS. NIXON: Your Honor if we can come back September 14th or 21st?

THE COURT: What date?

MS. NIXON: The 14th has a jury on it.

THE COURT: Doesn't matter.

MS. NIXON: Then the 14th.

THE COURT: State?

MR. KLEIST: By agreement.

THE COURT: By agreement 9-14, for sentencing. Mr. Smith, see you then.

DEFENDANT: Can I ask you, your Honor, one more question?

THE COURT: No. That's it."

¶ 39     On September 14, 2018, APD Nixon informed Judge Walowski that she was still awaiting a transcript in case number 11 CR 520001 to determine whether defendant was convicted of a Class 1 or a Class 4 felony. Based on defendant's belief that the classification of that offense was a Class 4 felony, APD Nixon told the court that "[i]n speaking to my supervisor, I was advised then to order the transcript to make sure, because sometimes things are written down incorrectly." The case was then continued for APD Nixon to obtain the transcript.

¶ 40     On November 27, 2018, the parties appeared before the Honorable William B. Raines, and APD Nixon informed the trial court that she received the transcripts that she had ordered and had discussed their contents with defendant.

¶ 41     On January 25, 2019, this matter returned to Judge Claps. APD Nixon tendered the sentencing transcript from case number 11 CR 520001 to the court, and the matter was continued to February 5, 2019.

¶ 42     On February 5, 2019, APD Nixon informed Judge Claps that she and defendant reviewed the records and transcripts from defendant's guilty pleas and that defendant's prior convictions made him subject to a Class X sentence as an armed habitual criminal.

¶ 43     When the court inquired whether defendant saw the transcript referenced by APD Nixon, the following colloquy transpired:

- 14 -

"DEFENDANT: Yes. That's right, but I don't feel like I'm armed habitual still.

THE COURT: Well, it's not a matter of you feeling it. It's a matter of your—this sentencing began January of last year. I stopped it because you raised concerns about whether you had been found guilty of something less than what the State proved in the trial. Do you remember that?

DEFENDANT: Yes. I remember this but do you feel that like I'm a valid person to be armed habitual?

THE COURT: Okay. I didn't write the statute."

¶ 44 The sentencing hearing then resumed. APD Nixon requested that the court impose a minimum six-year sentence where defendant's only criminal history involved drugs and where he had no prior history of gun possession. Defense counsel reiterated that defendant had no violent history, that his prior offenses were all drug-related, and that he had a daughter whom he had never been able to physically touch. Defendant made the following statement in allocution:

"DEFENDANT: Judge. I feel like I've been corrected. I will got some certain issues I need to work on though like, you know, priors that is going on and the lifestyle that I chose, but I still—I'm corrected though, and I got a daughter that I ain't even seen yet, that I ain't even touch yet, who I got picture of. I mean, I still want to be something out there. I still want to be a father. I want to do all of that, your Honor. I know I got to work on myself.

\* \* \*

And I'm going to do that. Judge. I'm just hoping that you could just find some type of way that I can—there is no type of way I can get something at 50 percent? There is no way because I almost feel like I'm a valid person—"

¶ 45 The court then sentenced defendant to 10 years' imprisonment on the armed habitual criminal conviction (count I) and merged the unlawful use or possession of a weapon by a felon convictions (counts III and IV) into count I. The court denied defendant's oral motion to reconsider. Defendant filed a timely notice of appeal.

¶ 46                                      II. ANALYSIS
¶ 47                                   A. Reasonable Doubt
¶ 48 In his first assignment of error, defendant maintains that the State failed to establish that he had the necessary qualifying prior convictions to be convicted of being an armed habitual criminal under count I of the indictment or unlawful use or possession of a firearm by a felon under counts III and IV of the indictment. When the sufficiency of the evidence is challenged, a criminal conviction will not be set aside unless the evidence, when viewed in the light most favorable to the prosecution, is so improbable or unsatisfactory that a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). This standard applies in all cases, regardless of the nature of the evidence. *People v. Pollock*, 202 Ill. 2d 189, 217 (2002). A reviewing court may not retry the defendant. *People v. Rivera*, 166 Ill. 2d 279, 287 (1995). The trier of fact assesses the credibility of the witnesses and the weight to be given to their testimony, resolves conflicts in the evidence, and draws reasonable inferences therefrom, and we will not substitute our judgment for that of the trier of fact on

these matters. *People v. Hommerson*, 399 Ill. App. 3d 405, 411 (2010). Testimony may only be found insufficient under the *Jackson* standard where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Due process requires the State to prove every element of the charged offense beyond a reasonable doubt. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2; *In re Winship*, 397 U.S. 358, 364 (1970).

¶ 49    To prove defendant guilty of being an armed habitual criminal as charged in count I, the State had to establish that on October 26, 2016, defendant knowingly possessed a firearm, after having been convicted of manufacture or delivery of a controlled substance under case number 13 CR 1314201 and manufacture or delivery of a controlled substance under case number 11 CR 520001, in violation of section 24-1.7(a) of the Criminal Code of 2012 (720 ILCS 5/24-1.7(a) (West 2016)).

¶ 50    To prove defendant guilty of unlawful use or possession of a weapon by a felon as charged in count III, the State had to establish that on October 26, 2016, defendant knowingly possessed on or about his person a firearm, after having been convicted of manufacture or delivery of a controlled substance under case number 13 CR 1314201, and that he was on parole or mandatory supervised release at the time of the offense, in violation of section 24-1.1(a) of the Criminal Code of 2012 (*id.* § 24-1.1(a)).

¶ 51    To prove defendant guilty of unlawful use or possession of a weapon by a felon as charged in count IV, the State had to establish that on October 26, 2016, defendant knowingly possessed on or about his person firearm ammunition, after having been convicted of manufacture or delivery of a controlled substance under case number 13 CR 1314201, and that he was on parole or mandatory supervised release at the time of the offense, in violation of section 24-1.1(a) of the Criminal Code of 2012 (*id.*).

¶ 52    Defendant claims that the State failed to establish that he was the same individual named in both of the certified statements of conviction that were admitted at trial. The State, on the other hand, maintains that sufficient evidence supported the presumption that the individual named in the certified statements of conviction was defendant and that defendant has failed to undermine that presumption.

¶ 53    We begin by noting that the certified statements of conviction in both case number 13 CR 1314201 and case number 11 CR 0520001 are not included in the record on appeal. In his opening brief, defendant acknowledged that, at the time that he filed his opening brief, he was unable to obtain the certified statements of conviction but averred that he would move to supplement the common-law record with the documents if he became able to do so.

¶ 54    The State, citing *People v. Reed*, 2013 IL App (1st) 113465, ¶ 21, and *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984), faults defendant for failing to include the certified statements of conviction in the record on appeal and requests that we apply a presumption of correctness to the trial court's judgment and resolve all doubts against defendant.

¶ 55    In response to the State's charge, in his reply brief, defense counsel averred:

> "As an officer of the court, Smith's appellate counsel attests that prior to the withdrawal of the Office of the State Appellate Defender (OSAD) from this case in January 2020, OSAD paralegals checked the trial court file for the certified statements and did not find them. Counsel then contacted both trial counsel, APD Nixon, and one of her supervisors, APD Karen Dimond, who confirmed by email in July 2020 that the

certified statements were not in trial counsel's file. And in an email to appellate counsel sent on August 5, 2020, the trial prosecutor, ASA Todd Kleist, confirmed that the certified statements were not in his trial file. Finally, while appellate counsel normally would have asked this Court to take judicial notice of the Circuit Court Clerk's computer records for the prior convictions, because the certified statements undoubtedly were printed versions of those records, there can be no certainty in this case that the documents before the trial court were identical to what is reflected in the Clerk's *current* record-keeping system, which only became active in November 2019, well after Smith's trial. *See e.g.*, https://capitolfax.com/2019/11/26/36-2019). For this reason, this Court should not rely upon the Clerk's current information as a substitute for the State's evidence at trial."

¶ 56    The impound order in this matter does not reference the certified statements of conviction in either case number 11 CR 0520001 or case number 13 CR 1314201. It is true that is the appellant's duty to both preserve and present a sufficient record of an asserted error and that an incomplete record will trigger a presumption favorable to the judgment from which the appeal is taken. *People v. Stewart*, 179 Ill. 2d 556, 565 (1997). Such rule is relaxed, however, where the defendant bears no fault for the incomplete record and is able to establish a colorable need for the missing portion of the record in order to obtain appellate review of his claim. *People v. Appelgren*, 377 Ill. App. 3d 137, 142-43 (2007).

¶ 57    In *Appelgren*, the defendant alleged that, due to no fault on his part, a missing audiotape that comprised a key piece of evidence in the State's case could not be made part of the record on appeal. The defendant's efforts to obtain the missing audiotape included contacting the clerk of the circuit court, the state's attorney's office, and the trial judge, and when none of those channels were successful, the defendant filed a motion to compel the production of the audiotape in the appellate court. *Id.* at 143. The appellate court then ordered the clerk of the circuit court to produce the exhibit or file an affidavit stating why the exhibit was not available. The clerk filed an affidavit stating that the exhibit was made part of the court file, as it was not provided to the clerk's office. *Id.*

¶ 58    In considering the defendant's claim, the appellate court noted that the State offered the audiotape into evidence and that the record did not reflect that the trial court ordered any party other than the State to retain the evidence. *Id.* at 143-44. Where the defendant's diligent efforts to locate the missing recording were unsuccessful and where it was the practice in Winnebago County that a party retain an exhibit unless otherwise ordered by the court, the appellate court found that the defendant established a colorable claim for the missing exhibit and agreed that the defendant could not receive proper appellate review of his claim in the absence of such evidence. *Id.* at 143-45. As such, the court reversed his conviction and remanded the matter for a new trial. *Id.* at 145.

¶ 59    Here, defendant maintains that the record is sufficient for us to review his claim that the State failed to establish an element of the offenses charged in counts I, III, and IV but asks that the absence of the certified statements of conviction from the record on appeal not be held against him. We are troubled by the State's request that we apply a presumption of correctness of the trial court's ruling and resolve all doubts against defendant where defendant appears to have done everything within his power to obtain the certified statements of conviction that were introduced by the State to prove an element of the offenses charged in counts I, III, and IV. We find that defendant has presented a sufficient record in support of his claim of error

- 17 -

and do not invoke the presumption of correctness nor resolve any doubts against defendant, where the absence of the certified statements of convictions is not fairly attributed to him.

¶ 60    As an aside, we note that there does not appear to be any genuine issue of fact as to the name that accompanies each of the prior statements of conviction, where both the trial court and an assistant state's attorney spread of record the fact that the certified statement of conviction in case number 13 CR 1314201 bears the name "Rashawn Smith" while the certified statement of conviction in case number 11 CR 520001 bears the name "Rashawn T. Smith."

¶ 61    Thus, we turn to the substance of defendant's claim. In *People v. Davis*, 95 Ill. 2d 1, 30 (1983), at the eligibility phase of the defendant's sentencing hearing, the State introduced certified copies of two prior indictments and murder convictions indicating that "Girvies L. Davis" was convicted of the murders of two individuals and the attempted murder of a third individual. An employee of the circuit court clerk's office testified that the certified copies of conviction represented convictions of the defendant, and defense counsel neither cross-examined the witness as to the basis of her knowledge nor moved to strike her testimony because she failed to identify the defendant. *Id.* The defendant did argue, however, that the State failed to establish that he was the same person named in the documents. *Id.*

¶ 62    The court rejected the defendant's contention and adopted "the general rule that identity of name gives rise to a rebuttable presumption of identity of person." *Id.* at 31. Citing its earlier decision in *People v. Davis*, 65 Ill. 2d 157 (1976), the court noted that the presumption was founded on "considerations of judicial economy and efficiency essential to the disposition of present-day caseloads" and that additional procedural requirements were not necessary or useful where a defendant did not deny the fact of the prior conviction. (Internal quotation marks omitted.) *Davis*, 95 Ill. 2d at 31.

¶ 63    In *People v. Smith*, 209 Ill. App. 3d 795, 802 (1991), the appellate court held that the presumption of identity articulated in *Davis* did not apply when a defendant's commission of a prior felony was an element of the offense.

¶ 64    The supreme court reversed, finding that the presumption of identity could be used to satisfy an element of an offense if the defendant's name were the same as the name contained in the certified statement of conviction. *People v. Smith*, 148 Ill. 2d 454, 465 (1992).

¶ 65    The parties have discussed a number of cases that have considered whether the presumption of identity applies or is rebutted by a discrepancy between the defendant's name as alleged in the charging instrument and as alleged in the certified statement of conviction. We discuss them in turn.

¶ 66    In *People v. Moton*, 277 Ill. App. 3d 1010, 1011 (1996), after being charged as " 'William Moton,' " the defendant was reindicted with an added alias of " 'William B. Morton.' " At trial, a certified statement of conviction from Tennessee for " 'William B. Morton' " was admitted in evidence to establish an element of the offense, namely, the defendant's status as a convicted felon. *Id.*

¶ 67    Although the defendant did not object to the use of the alias in the indictment or to the admission of the Tennessee conviction documents, the court noted that no authority had extended the presumption of identity to a case where the State's charging instrument included aliases. *Id.* at 1012. The court determined that the presumption of identity did not apply in such circumstances, as an "indictment itself can no more substitute for evidence of defendant's use

of aliases than it can be used to prove defendant's commission of the crime it charges." *Id.* at 1013.

¶ 68    The court also rejected the State's claim that its burden of proof could be satisfied by the court taking judicial notice of birth dates appearing on documents after the parties rested and the proofs were closed. *Id.* In the absence of a presumption of identity, where no evidence established the defendant's commission of the underlying felony, the court reversed the defendant's conviction outright. *Id.*

¶ 69    In *People v. White*, 311 Ill. App. 3d 374, 375-76 (2000), the jury convicted the defendant of multiple charges, including unlawful possession of a weapon by a felon. The charging instrument named the defendant as " 'Derrick S. White,' " while the prior conviction referred to the defendant as both " 'Derrick' " and " 'Derick' " and contained the middle initials " 'U.S.' " instead of " 'S.' " *Id.* at 381. The trial court took judicial notice of the existence of a prior conviction under case number 87 CF 1701 and the fact that it was captioned " 'People of the State of Illinois versus Derrick White,' " but left to the deliberating jury the factual question of whether the defendant was convicted of a felony in that case. *Id.* at 380-81.

¶ 70    In considering the presumption of identity, the court noted, "[w]here a presumption of identity does not exist because of variances in name, or where the defendant rebuts the presumption, the State must, in addition to having the court take judicial notice of the record, offer additional evidence to substantiate that the defendant is the person named in the record." *Id.* at 381. While the variances in the defendant's name disallowed application of the presumption of identity, the State successfully proved the defendant's identity, where, in addition to the statement of conviction under the variant name, the State offered the testimony of a correction officer who identified the defendant as the individual named in the prior conviction and the testimony of a Motel 6 clerk who testified regarding a receipt signed by the defendant and a driver's license and identification card bearing the name " 'Derick U. White.' " *Id.* at 382.

¶ 71    In *People v. Brown*, 325 Ill. App. 3d 733, 735 (2001), the court found that a discrepancy between the charging document, which named the defendant as "John Brown," and the certified statement of conviction, for "John E. Brown," defeated the presumption of identity and required additional proof to satisfy an element of the offense of unlawful use of a weapon by a felon. In the absence of any evidence establishing that "John Brown" and "John E. Brown" were the same person, the defendant's guilt was not proven beyond a reasonable doubt. *Id.*

¶ 72    In *People v. Bell*, 327 Ill. App. 3d 238, 240 (2002), the defendant was indicted for unlawful possession of a weapon by a felon under the name " 'Shawn Earl Bell AKA: Bell, Shawn E.,' " and a certified statement of conviction for " 'Shawn Bell' " was used to prove that the defendant was a convicted felon. The defendant did not object to the admission of the certified statement of conviction at trial, and his attorney admitted that the prosecutor could prove up the conviction. *Id.* Under these circumstances, the court affirmed by applying the doctrine of invited error, noting that "[a] defendant may not ask the trial court to proceed in a certain manner and then contend in a court of review that the judgment he obtained was in error." *Id.* at 241.

¶ 73    In *People v. Coleman*, 409 Ill. App. 3d 869, 873 (2011), the defendant relied on both *Brown* and *Moton* to support his claim that the State failed to prove his guilt beyond a reasonable doubt where he was charged as "Jesse Coleman," but the certified statement of conviction admitted against him named the offender as " 'Jessie Coleman.' " The court found that the

variant spelling of " 'Jessie' " in the statement of conviction did not defeat the presumption of identity where the defendant did not object to the admission of such evidence at trial, did not allege that such evidence was insufficient to prove an element of the offense, and never asserted, either at trial or on appeal, that he was not the individual named in the certified statement of conviction. *Id.* at 876. The court further noted that the record otherwise indicated that the defendant's criminal history report named him as " 'Jessie Coleman,' " listed his use of the alias at least eight times between 1975 and 2002, and listed four convictions under this name. *Id.* Viewing the evidence in the light most favorable to the State, the court concluded that a rational trier of fact could have found the defendant to be the same person named in the certified statement of conviction. *Id.* at 877.

¶ 74       Our examination of the foregoing cases leads us to conclude that the State's evidence was insufficient to establish that defendant was the person named in case number 11 CR 520001 but was sufficient to establish that he was the person named in case number 13 CR 1314201. As such, for the reasons that follow, we reverse his conviction for being an armed habitual criminal in count I but affirm his convictions for unlawful use or possession of a weapon by a felon in count III and count IV, and we remand for sentencing on those charges.

¶ 75       We begin by considering the certified statement of conviction in case number 11 CR 520001. The named offender, in that case, was "Rashawn T. Smith," the same name denoted as defendant's alias in the indictment. The State urges us to apply the presumption of identity since the two names are identical. This very request was made and rejected in *Moton*, 277 Ill. App. 3d at 1013, for reasons which we find to be equally valid today.

¶ 76       The State's attempt to distinguish *Moton* minimizes the court's holding in that case. While it is certainly true that the variation in defendant's name in this case is not as significant as that in *Moton*, we understand *Moton* to establish a narrow exception to the presumption of identity when a defendant is charged under a primary name as well as an alias and when the certified statement of conviction relates to the name alleged to be the defendant's alias, because reliance on an alias undermines the presumption of identity. *Moton* put it thusly, "charging a defendant under an alias raises a question of identity on the face of the charging document, which, if material, must be resolved by the evidence." *Id.* at 1012.

¶ 77       While the salutary goals of judicial economy and efficiency expressed in *Davis*, 95 Ill. 2d at 31, are achieved when a single name is expressed in a charging instrument, we believe that those goals are no longer well served by a charging instrument that permits a presumption of identity to flow from an otherwise-unproven alias.

¶ 78       Here, the indictment alleged that the offense was committed by "Rashawn Smith also known as Rashawn T Smith." At trial, no witness identified defendant by any name. While the State represented that the certified statements of conviction were for "the defendant, Rashawn Smith," when moving to have them admitted in evidence, a later statement by the prosecutor and findings of fact made by the trial court established that the conviction in case number 11 CR 520001 was for "Rashawn T. Smith." While interposing no objection to the self-authenticating nature of the certified statements of conviction, defense counsel repeatedly refused to stipulate that the individual identified in those documents was defendant.

¶ 79       Defendant's position was not tantamount to a stipulation to an element of the offense. "The primary rule in the construction of stipulations is that the court must ascertain and give effect to the intent of the parties." *People v. Woods*, 214 Ill. 2d 455, 468-69 (2005). Defendant did not stipulate that he was the person named in the certified statements of conviction.

Additionally, the record in this matter contains no hint of gamesmanship on the part of defense counsel, where the court's remarks suggest that the State requested that defendant stipulate to the issue of identity but that defendant refused to do so. Nor did defendant object to the multiple continuances of this bench trial for the State to present additional evidence on this issue.

¶ 80    The State's conduct following defendant's refusal to stipulate clearly shows that the significance of this refusal was not lost on the State. The State immediately informed the court that it was not prepared to rest and sought three additional continuances to present additional evidence establishing defendant's identity as the person named in the certified statements of conviction. Yet three continuances later, the State rested without presenting any additional evidence, without asking the court to take judicial notice of any matters of public record, and without offering any explanation as to why it produced no additional proof of defendant's identity.

¶ 81    Applying *Moton* to the facts of this case, we find that the indictment's reference to defendant's alias of "Rashawn T. Smith" and the certified statement of conviction in case number 11 CR 520001, standing alone, were legally insufficient to establish defendant's commission of that offense. In *Moton*, defense counsel neither objected to the use of aliases in the indictment nor objected to the admission of the prior convictions in evidence. *Moton*, 277 Ill. App. 3d at 1013. Nevertheless, the court held that the State was not absolved of its obligation to prove every element of the crime beyond a reasonable doubt, noting "[o]bviously, it is not a defendant's responsibility to assist the prosecution by signalling gaps in the State's evidence." *Id.* Here, the defense did signal the gap in the State's evidence, and the State appeared to recognize the signal yet decided that no more was required. Insofar as the certified statement of conviction in case number 11 CR 520001 is concerned, the State was wrong.

¶ 82    Nor was the failure of proof "cured" by the trial court taking *sua sponte* judicial notice of public records maintained by the clerk of the court that revealed that the IR numbers affiliated with case number 11 CR 520001 and case number 13 CR 1314201 matched the IR number on file for defendant. We agree with defendant that the trial court's actions were not sanctioned. See *id.*

¶ 83    Judicial notice may be used to prove a prior conviction in lieu of using a traditional method by record and identity of person. *Davis*, 65 Ill. 2d at 165. In *Davis*, our supreme court held that the doctrine of judicial notice included readily verifiable sources of indisputable accuracy. *Id.* While a sound basis exists for concluding that the doctrine of judicial notice would include records kept by the clerk of the circuit court, particularly where these offenses were all committed in Cook County (see *People v. Scott*, 278 Ill. App. 3d 468, 475 (1996)), a trial court is prohibited from taking judicial notice of facts *sua sponte* after the close of evidence (see *People v. Barham*, 337 Ill. App. 3d 1121, 1129 (2003)).[5] "When a defendant in a criminal case waives trial by jury and submits his rights and liberty to a judge, that judge is in the identical

---

[5]As we previously noted, one month before these offenses were committed, we issued an order relating to case number 13 CR 1314201 in *People v. Smith*, 2016 IL App (1st) 140053-U, ¶ 14. The trial court, however, was not asked to take judicial notice of this order and only referenced it after finding defendant guilty as charged. We will not, as a court of review, take judicial notice of critical evidentiary material that was neither presented to nor considered by the trial court. *Barham*, 337 Ill. App. 3d at 1130.

position of the jury and all the recognized rules for the protection of the defendant's rights apply with equal force." *People v. Rivers*, 410 Ill. 410, 419 (1951).

¶ 84    In *Barham*, the defendant maintained that the State failed to establish that he was guilty of reckless homicide where no proof established that he drove at a speed that was greater than reasonable and proper with regard to existing traffic conditions and the safety of persons on the roadway. On appeal, the State maintained that the trial court could have taken judicial notice that the maximum speed for passenger vehicles traveling on two-lane highways in Illinois was 55 miles per hour under the Illinois Vehicle Code (625 ILCS 5/11-601(d) (West 2000)). *Barham*, 337 Ill. App. 3d at 1129. The court disagreed, noting that:

> "In rare instances, a trial judge may take judicial notice, *sua sponte*, of facts, as long as the judge makes clear during the course of the trial and not after the evidence is closed what facts and sources are included in the *sua sponte* notice. See *People v. Rotkvich*, 256 Ill. App. 3d 124, 130, 628 N.E.2d 888, 893 (1993); *People v. Speight*, 222 Ill. App. 3d 766, 772, 584 N.E.2d 392, 396 (1991), *rev'd on other grounds*, 153 Ill. 2d 365, 606 N.E.2d 1174 (1992). It is well established that concepts of fair play require that all parties to an action be given a fair opportunity to confront and to rebut any evidence which might be damaging to their position. See *Drovers National Bank of Chicago v. Great Southwest Fire Insurance Co.*, 55 Ill. App. 3d 953, 957, 371 N.E.2d 855, 858 (1977). A party has the same right to rebut evidence admitted by *sua sponte* judicial notice as it does to rebut evidence introduced by the opposing party." *Id.*

¶ 85    The court concluded that the State's failure to ask the trial judge to take judicial notice of the Illinois Vehicle Code prior to the close of the evidence and the trial court's failure to announce that it was doing so in a timely fashion left an element of the offense unproven and required reversal of the defendant's reckless homicide conviction. *Id.* at 1130.

¶ 86    Here, the State rested without presenting any additional evidence or requesting that the trial court take judicial notice of anything that might establish that defendant was the individual named in case number 11 CR 520001. The State has therefore failed to establish that defendant was the person named in case number 11 CR 520001. As such, we vacate defendant's conviction for being an armed habitual criminal.

¶ 87    Our finding, however, is limited to the certified statement of conviction in case number 11 CR 520001 and does not extend to the certified statement of conviction in case number 13 CR 1314201. We believe that the narrow exception to the presumption of identity articulated in *Moton* necessarily applies to the certified statement of conviction in case number 11 CR 520001 but are not convinced that the presumption of identity is necessarily eviscerated insofar as a certified statement of conviction in defendant's "true name" is concerned. In *People v. Grizzel*, 382 Ill. 11, 24 (1943), our supreme court held that a defendant's "true name is that which precedes an *alias dictus*." Here, defendant's "true name" of Rashawn Smith was identical to the name contained in the certified statement of conviction in 13 CR 1314201, and a fair argument could be made that the presumption of identity still applies to this charge.

¶ 88    In this regard, we reject defendant's claim that, "in general, the presumption is rebutted when the defendant denies the prior convictions are his." *People v. Gregory*, 264 Ill. App. 3d 569, 574 (1993). In *Gregory*, the trial court rejected the defendant's claim that the State failed to establish that he was the same individual named in a certified statement of conviction, finding that " 'by bringing up the certified copy [of conviction] it's presumed to be the defendant unless evidence is introduced to the contrary.' " *Id.* at 571. The appellate court

- 22 -

approved the trial court's ruling, finding, "[a]ccordingly, we hold that the State's introduction of a certified copy of a prior conviction of a felony containing a name identical to that of the defendant raises a rebuttable presumption that the defendant was convicted of that prior felony; and where the defendant offers no evidence to rebut that presumption, the certified copy of the conviction is alone sufficient to satisfy the State's burden of proof on the issue of identity." *Id.* at 574.

¶ 89 Based on *Gregory*, the presumption of identity is not "rebutted" by a defendant's mere denial that he is the individual identified in the certified statement of conviction. That aside, we need not decide whether the presumption of identity has no application when the State elects to charge a person under his or her true name and under an alias.

¶ 90 Although not discussed by the parties, we find that evidence presented by the State at trial established defendant's identity as the individual named in the certified statement of conviction in case number 13 CR 1314201. We may affirm the trial court on any basis supported by the record on appeal. *People v. Dinelli*, 217 Ill. 2d 387, 403 (2005).

¶ 91 At trial, defendant's custodial statements were admitted in evidence. This evidence was included in the record on appeal, and we have reviewed it. In addition to defendant admitting that the firearm recovered from the Nissan Sentra was loaded and was purchased by him, defendant told Detective Baker that he was discharged from the Department of Corrections on May 3, 2016, after serving a three-year sentence for a drug charge and that he was on parole. This, in conjunction with the certified statement of conviction for Rashawn Smith in case number 13 CR 1314201, was sufficient to establish that defendant committed unlawful use or possession of a firearm by a felon as charged in count III and count IV beyond a reasonable doubt. See *White*, 311 Ill. App. 3d at 382.

¶ 92 As such, defendant's conviction for unlawful use of a weapon by a felon under counts III and IV is affirmed, and we remand this case for the imposition of sentences on those counts. See *People v. Beck*, 2019 IL App (1st) 161626, ¶ 36; *People v. Goodwin*, 2018 IL App (1st) 152045, ¶¶ 62-63.

¶ 93                                B. *Krankel* Claim

¶ 94 Defendant also claims that he is entitled to have this matter remanded for a *Krankel* inquiry because the trial court failed to conduct any inquiry into defendant's posttrial claim of ineffective assistance of counsel. The State maintains that defendant's conduct did not prompt an inquiry. For reasons that follow, we find that Judge Walowski did indeed conduct an inquiry and that such inquiry satisfied the requirements of *People v. Krankel*, 102 Ill. 2d 181 (1984), and its progeny.

¶ 95 Beginning with *Krankel*, 102 Ill. 2d at 189, our supreme court established a common-law procedure for considering *pro se* posttrial claims of ineffective assistance of counsel. We consider the principles that potentially apply to defendant's contention of error, starting with our supreme court's statement in *People v. Moore*, 207 Ill. 2d 68, 79 (2003), that "[a] *pro se* defendant is not required to do any more than bring his or her claim to the trial court's attention." When a defendant raises a *pro se* posttrial claim of ineffective assistance of counsel, the circuit court should conduct an inquiry into the factual basis of the claim. *People v. Alexander*, 2020 IL App (3d) 170829, ¶ 23. A *pro se* defendant may raise the claim orally or through a written motion, a letter, or a note to the court. *People v. Ayres*, 2017 IL 120071, ¶ 11. If the trial court conducts a preliminary investigation of the defendant's allegations and

determines them to be spurious or pertaining only to trial tactics, no new counsel should be appointed to represent the defendant. *People v. Ramey*, 152 Ill. 2d 41, 52 (1992). If, however, the defendant's allegations of incompetence indicate that trial counsel neglected the defendant's case, the court should appoint new counsel to argue the defendant's claims of ineffective assistance of counsel. *People v. Nitz*, 143 Ill. 2d 82, 134-35 (1991).

¶ 96 The court is not required to automatically appoint new counsel but must conduct some type of inquiry into the underlying factual basis of a defendant's posttrial claim of ineffective assistance of counsel. *Moore*, 207 Ill. 2d at 79. The court's duty to inquire is to facilitate the trial court's consideration of the defendant's *pro se* claims in order to potentially limit the issues on appeal. *People v. Jolly*, 2014 IL 117142, ¶ 38. *Krankel* "serves the narrow purpose of allowing the trial court to decide whether to appoint independent counsel to argue a defendant's *pro se* posttrial ineffective assistance claims." *People v. Patrick*, 2011 IL 111666, ¶ 39.

¶ 97 When conducting the inquiry, some interchange between the court and trial counsel regarding the defendant's claims is permissible and usually necessary in determining whether to appoint counsel. *Moore*, 207 Ill. 2d at 78. The court is also permitted to discuss the allegations with the defendant. *Jolly*, 2014 IL 117142, ¶ 30; see *People v. Roddis*, 2020 IL 124352, ¶ 35.

¶ 98 On appeal, "[t]he operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." *Moore*, 207 Ill. 2d at 78. Whether the trial court properly conducted a preliminary *Krankel* inquiry is a legal question that is reviewed *de novo*. *Roddis*, 2020 IL 124352, ¶ 33.

¶ 99 We have previously set out a highly detailed factual account of defendant's interactions with both Judge Claps and Judge Walowski in order to fulfill our obligation to "adhere to a case-by-case, fact-specific examination, driven by the record." *Id.* ¶ 64. We recount the relevant portions of those interactions now.

¶ 100 On June 1, 2018, this matter appeared before Judge Claps, who, upon granting retained counsel's motion for leave to withdraw, asked defendant whether he would be retaining new counsel or requesting "*pro bono*" counsel. When defendant indicated that he wanted to ask questions "[r]egarding the armed habitual, things like that," Judge Claps told defendant that he could not answer any questions until the defendant was represented by counsel. At this point, Mr. Lewis informed the court that defendant had concerns as to the classification of his prior convictions and that he would benefit from "another public defender or another attorney reviewing some of his case and information." Defendant indicated that "the plan is to get a new lawyer," and the case was continued for that purpose.

¶ 101 On June 28, 2018, Judge Claps and defendant discussed the matter of who would represent defendant going forward. Defendant indicated that he believed the court was "going to hire a *pro bono*." The judge disagreed that he had made such a representation but then asked defendant, "That's what you want me to try to do is find a *pro bono* attorney?" Defendant then told the court, "I would appreciate, your Honor," to which the court replied "I'll try" and continued the case to July 30, 2018.

¶ 102 When defendant then appeared before Judge Walowski on July 30, 2018, Judge Walowski was obviously surprised when defendant informed her that Judge Claps had previously indicated that a *pro bono* attorney would be hired to represent him, and APD Biel, who was present at that time but not appointed to represent defendant, informed Judge Walowski that

he had notes that supported defendant's version of events. Judge Walowski said that she would look into the matter because she believed that the Office of the Public Defender should have been reappointed to represent defendant. Judge Walowski granted defendant's motion for a continuance to contact a *pro bono* attorney through the Chicago Bar Association.

¶ 103    A conversation then transpired between defendant and APD Biel outside of the courtroom, defendant's case was recalled, and defendant requested the appointment of the Office of the Public Defender. APD Biel addressed the court and explained that he spoke to defendant outside the presence of the court and promised to bring the issue of the falling out between defendant and APD Nixon to the attention of a supervisor to determine whether a different assistant public defender might be assigned to represent defendant. The court then told defendant that it was willing to reappoint the Office of the Public Defender to represent him, that defendant would not be able to select an attorney of his choosing, that it would make sense for APD Nixon to be appointed, and that, after that decision was made by the Office of the Public Defender, "then we'll see what happens, okay?" It was at this point that defendant stated: "All right. Because, yeah, I had her—wrote a grievance on her with ARDC, so it was a lot of things she didn't do in my trial that should have been done."

¶ 104    A lengthy discussion followed. The court inquired as to the procedural posture of this case, and defendant indicated that he had not yet been sentenced. ASA Kleist informed the court that this case had been continued because defendant had alleged that his criminal history did not qualify him to be sentenced as a Class X offender. When APD Biel indicated that counsel would only be appointed for purposes of a sentencing hearing, defendant disagreed and expressed his desire to challenge his convictions. Judge Walowski told defendant that he could seek to reopen a motion for new trial if there was something not contained in the previous motion that defendant wished to raise, and defendant agreed that this is what he intended to do before Judge Claps.

¶ 105    The court then instructed APD Biel to "take a look into the case, talk to Mr. Smith. See what, if any issues he may want raised before sentencing. We can address that on the next court date." When defendant replied, "A lot of issues, your Honor," the court told either defendant or APD Biel[6] that he "could take a look at what was raised before" and, in the meantime, defendant could "look into the Chicago Bar Association, okay?" Additionally, in response to defendant asking whether he could file a motion before the court on the next court date, the court replied that defendant could file the motion before any judge who was sitting in the courtroom, and defendant stated "[t]hat's exactly what I want to do."

¶ 106    On the next court date of August 24, 2018, defendant did not file a motion but appeared, now represented by APD Nixon. The court addressed APD Nixon: "You were going to talk to him about whether there was anything that you are willing to file after speaking to him." APD Nixon spread of record that she spoke with defendant about possibly filing a new motion but that she had no new information to add to a motion for new trial. APD Nixon indicated that she was awaiting a copy of the transcript from the sentencing hearing as well as a transcript from the sentencing hearing for a drug charge that defendant maintained was not a Class 2 felony.

---

[6]The record is not clear as to whom Judge Walowski was addressing at this point, but given the context of the conversation, it would appear to be directed to APD Biel.

¶ 107    At this point, the issue that was originally raised by defendant before Judge Claps, whether defendant's criminal history qualified him for a Class X sentence under the armed habitual criminal count, was discussed at length. The court questioned APD Nixon as to whether she verified that defendant possessed the necessary criminal convictions to be convicted of being an armed habitual criminal. APD Nixon replied that she had done so for both case number 13 CR 1314201 and case number 11 CR 520001 but wanted to ensure that the information was correct by reading transcripts from those matters.

¶ 108    The court questioned counsel as to whether this issue was "the bone of contention," to which APD Nixon replied "Yes, your Honor." Defendant was then given leave to address the court and stated, "I was trying to understand like about this whole armed habitual thing. I'm not a violent person. This is my first possession of firearm. I've been fighting this since 2016, for 22 months now."

¶ 109    The court addressed defendant and explained how defendant's prior convictions qualified him for Class X sentencing as an armed habitual criminal. The court also addressed additional concerns raised by defendant, including whether a predicate felony committed when he was a minor could be relied on for the armed habitual criminal count and the State's failure to call a clerk to testify and "verify" defendant's prior charges.

¶ 110    With regard to the latter claim, APD Nixon addressed the court: "There was an issue during the trial. I did not stipulate to the prior convictions. So when I was talking to my client, the possible things that can happen, how the State can prove those prior convictions, that was one thing I mentioned. Not that the State would have to have done that."

¶ 111    Judge Walowski followed up with additional questions that established that certified statements of conviction were admitted at trial and noted, "That's sufficient. A certified copy of conviction is sufficient for them to prove you were convicted of two prior felonies." Defendant maintained, "I don't understand how I took time to a class one." APD Nixon then declined to resume defendant's sentencing hearing "[b]ecause there is that question. His belief was it was a class four in 2011."

¶ 112    The case was continued for APD Nixon to receive the transcript in 11 CR 0520001 to determine whether defendant was convicted of a Class 1 or a Class 4 felony. APD Nixon informed the court that, after speaking with her supervisor, she wished to see the transcript to be sure that defendant's prior conviction qualified for him to be convicted as an armed habitual criminal. Judge Walowski granted defendant's motion to continue the matter for this determination to be made. This was the end of Judge Walowski's involvement in this matter.

¶ 113    The case returned to the trial call of Judge Claps. APD Nixon provided the court with the sentencing transcript in case number 11 CR 05200, which conclusively rebutted defendant's belief that he was not convicted of a felony that qualified him to be sentenced as an armed habitual criminal. Defendant acknowledged that he reviewed the transcript with APD Nixon and never uttered another complaint about her either in writing or orally.

¶ 114    In the face of the foregoing facts of record, defendant alleges that the facts of this case are "nearly identical" to those presented in *Ayres*, 2017 IL 120071, while the State maintains that the defendant did not assert a clear claim of ineffective assistance of counsel to require an inquiry under *People v. Cunningham*, 376 Ill. App. 3d 298 (2007). We disagree with both contentions.

¶ 115    *Ayres* is not "nearly identical" to this case. In *Ayres*, the defendant admitted violating the terms of his conditional discharge and was subsequently sentenced to seven years' imprisonment. *Ayres*, 2017 IL 120071, ¶ 5. His attorney filed a motion to reconsider his sentence the same day that the defendant mailed a *pro se* petition to withdraw his guilty plea and vacate his sentence that alleged " 'ineffective assistance of counsel.' " *Id.* ¶ 6. In the defendant's absence, the court denied counsel's motion to reconsider sentence and never considered or referenced the defendant's *pro se* filing. *Id.* The appellate court affirmed, finding that the defendant's mere recitation of " 'ineffective assistance of counsel' " was insufficient to trigger the court's duty to inquire. *Id.* ¶ 7.

¶ 116    The supreme court reversed, finding that, "when a defendant brings a clear claim asserting ineffective assistance of counsel, either orally or in writing, this is sufficient to trigger the trial court's duty to conduct a *Krankel* inquiry." *Id.* ¶ 18. Thus, under *Ayres*, a claim of ineffective assistance of counsel that is brought to the attention of the court by the defendant, standing alone, is sufficient to require an inquiry.

¶ 117    The State, however, relies on *Cunningham*, 376 Ill. App. 3d 298, to support its contention that Judge Walowski was not required to make any inquiry in this case. In *Cunningham*, after the defendant was found guilty, at sentencing, trial counsel informed the court that the defendant had filed a complaint against him with the ARDC and requested a continuance in order for new counsel to be appointed to represent the defendant. *Id.* at 300. The court allowed the motion and new counsel, an associate in the same private law firm, represented the defendant at sentencing. *Id.* at 300-01.

¶ 118    In reviewing the defendant's claim that the trial court should have inquired into the factual basis of the ARDC complaint, the appellate court held:

> "To invoke the rule announced in *Krankel* and its progeny, however, a defendant must at least make *some* allegation of ineffective assistance of counsel for the court to consider and must provide some factual specificity of the reason for the allegation. See *People v. Ward*, 371 Ill. App. 3d 382, 431-34 (2007). Mere awareness by a trial court that a defendant has complained about his counsel's representation imposes no duty on the court to *sua sponte* investigate a defendant's complaint. See *Ward*, 371 Ill. App. 3d at 434." (Emphasis in original.) *Id.* at 304.

¶ 119    The court concluded that the appointment of new counsel rendered moot the need for any inquiry. *Id.* at 305-06.

¶ 120    *Cunningham* does not support the State's claim. Putting aside the fact that the court's ruling is at least partially invalidated by *Ayres* where it required "factual specificity of the reason for the allegation," the facts are clearly distinguishable from those presented here. Defendant made an in-court assertion of ineffective assistance of counsel and received the services of the same attorney who was the subject of the claim. That assertion required an inquiry by the trial court. See *Ayres*, 2017 IL 120071, ¶ 18; *People v. Jackson*, 243 Ill. App. 3d 1026, 1035-36 (1993).

¶ 121    In *Jackson*, after the defendant was convicted, defense counsel moved to withdraw based on a conflict of interest, as the defendant had filed an ARDC complaint against him. *Jackson*, 243 Ill. App. 3d at 1033-34. The trial court denied defense counsel's motion. *Id.* at 1034-35. In reviewing the propriety of the trial court's ruling, the appellate court found that the trial court was required to make a preliminary inquiry into the nature of the defendant's allegations in the ARDC complaint to determine whether a conflict of interest existed. *Id.* at 1035.

¶ 122 Under *Ayres* and *Jackson*, we disagree with the State's contention that Judge Walowski was under no obligation to conduct an inquiry. We also disagree, however, with defendant's claim that he is entitled to have this matter remanded for a *Krankel* inquiry based on Judge Walowski's alleged failure to conduct any inquiry into defendant's claim. The record here affirmatively rebuts this claim and demonstrates that Judge Walowski provided defendant ample opportunity to address the court and air any grievances that he had and, in response to his expressed concerns, conducted a thorough inquiry to ensure that she understood the gravamen of defendant's complaints. The court's inquiry included questioning counsel and ultimately determining that defendant's complaints were unfounded. The court then provided defendant a detailed basis for why it was rejecting defendant's complaints. Following the court's extensive inquiry, defendant never uttered another complaint against APD Nixon to either Judge Walowski or to Judge Claps when this matter was ultimately reassigned to him.

¶ 123 We find that Judge Walowski properly discharged her duty to inquire into defendant's posttrial allegation of ineffective assistance of counsel and reject defendant's request that we remand this matter for a further *Krankel* inquiry.

¶ 124                                    III. CONCLUSION

¶ 125 For the foregoing reasons, we vacate defendant's armed habitual criminal conviction in count I, affirm defendant's unlawful use or possession of a weapon by a felon convictions in counts III and IV, and remand for resentencing on those counts.

¶ 126 Affirmed in part and vacated in part; cause remanded.