2022 IL App (2d) 190927-U
No. 2-19-0927
Order filed April 20, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-2755 |
| SCOTTIE A. PULLIAM, | ) ) ) | Honorable Brendan A. Maher, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices McLaren and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Trial counsel's cross-examination of two witnesses did not amount to ineffective assistance of counsel.  Following a preliminary *Krankel* inquiry, the trial court erred in failing to appoint counsel for further posttrial proceedings.

¶ 2    Following a jury trial, the defendant, Scottie Pulliam, was found guilty of predatory criminal sexual assault (720 ILCS 5/11-1.4(a)(1) (West 2018)) and aggravated criminal sexual abuse (*id.* § 11-1.60(b)).  On appeal, the defendant argues that he received ineffective assistance of counsel and is entitled to a new trial.  Alternatively, he argues that the trial court erred in denying

his *pro se* posttrial claim of ineffective assistance of counsel following a preliminary hearing. We affirm in part, vacate in part, and remand for further proceedings.

¶ 3                                    I. BACKGROUND

¶ 4      On October 26, 2018, the defendant was charged by criminal complaint. Count 1 alleged that the defendant committed predatory criminal sexual assault (*id.* § 11-1.4(a)(1)) by knowingly committing an act of penetration with the victim, his daughter S.P., at a time when she was under 13 years of age by inserting his penis into her vagina. Count 2 alleged that the defendant committed aggravated criminal sexual abuse (*id.* § 11-1.60(b)) by committing an act of sexual conduct with the victim, a family member who was under 18 years of age, by placing his penis on the victim's vagina.

¶ 5      A jury trial commenced on May 28, 2019. At trial, Detective Janie Martin testified that she was a detective with the Rockford police department and investigated sex crimes and child abuse allegations. On October 3, 2018, she was assigned to investigate this case as a result of a report by the Department of Children and Family Services (DCFS). The following day, she and the DCFS investigator, Quinten Ponius, went to the victim's high school to speak with her. They met in the principal's office, with the freshmen principal present, and talked for about 20 minutes. When Martin explained the reason for the meeting, the victim began to cry. Martin testified that she did not go into a lot of detail at this meeting because the victim seemed uncomfortable. She told the victim they would meet again at a later date.

¶ 6      Martin testified that she met the victim at the police station on October 8, 2018. The victim forwarded text messages to Martin that the victim had received from the defendant. Martin identified the text messages as People's Exhibit No. 1. At the meeting, the victim detailed the allegations against the defendant. Martin took a statement from the victim and the victim read and

signed it a few days later. Martin also interviewed the victim's mother, the victim's boyfriend and his mother, and the victim's half-sister Renee Hall. She also visited the victim's house.

¶ 7    Renee Hall, an other-crimes witness for the State pursuant to 725 ILCS 5/115-7.3 (West 2018), testified that the victim was her half-sister by the same mother. At the time of trial, Hall was 27 years old and the victim was 16. Hall was seven or eight years old when her mother started dating the defendant. Her mother and the defendant eventually married, and she lived with them in Rockford for a couple of years. She would spend the school year with her mother and the defendant but during Christmas and summer breaks she and her brothers would stay with their father in Chicago.

¶ 8    Hall testified that, in 2006, when she was about 14 years old and in eighth grade, she was living with her mother, the defendant, and her three brothers. It was near the end of the school year and she was excited the summer was coming. One night when she was asleep the defendant entered her bedroom, woke her up and gave her some tea to drink. The tea tasted "funny." She went back to sleep but the defendant returned later and told her to go downstairs. When she went downstairs, he told her to sit at the table and then he inserted his fingers into her vagina. She asked him what he was doing but he shushed her and then went back upstairs. She believed her mother was home and sleeping at the time. This was the first time such an incident occurred and it was the last time.

¶ 9    Hall testified that, at some point, the police came to her house to talk to her about the incident. She spent the summer with her father and also stayed with her grandfather for a time. She testified that she stayed with her grandfather "[b]ecause of what had happened. They didn't want me to stay in the house."

¶ 10    On cross-examination, Hall acknowledged that after the incident with the defendant she permanently moved to Chicago to live with her father.  When defense counsel asked why she moved, Hall said it was because DCFS became involved and did not want her to stay in the house with the defendant.  Hall further testified that she did not remember whether the police ever talked to the defendant about the incident or whether the defendant was arrested.  She never went to court.

¶ 11    The victim testified that she was born in September 2002.  She was 16 years old and the defendant was her father.  The victim testified that, starting when she was 12 years old, the defendant touched her with his hands and penis, including inserting his penis into her vagina.  It happened in her mother's bedroom.  Her mother worked the night shift and was at work when it occurred.  The last time it happened was in August 2018 when she was 15 years old.  When asked how many times it occurred, the victim said it was way too many times to count.

¶ 12    The victim further testified that she did not tell her mother right away.  In September 2018 she was dating a boy named DeShawn and she told him about it.  About two weeks later, DeShawn's mother came to her house to speak with her mother.  The victim eventually told her mother.  She stated that she did not tell her mother sooner because she was scared that her mother would get hurt physically and emotionally.  The victim acknowledged that she spoke with Martin in October 2018 and forwarded some text messages to her.  She identified People's Exhibit No. 1 as text messages between her and her father.  There are two texts from the defendant telling her to "come here."  One was sent at 2:03 a.m. on August 1, 2018, and the other was sent at 3:36 a.m. on August 19, 2018.

¶ 13    On cross-examination, the victim acknowledged that when she first met with Ponius at home with her mother present, she denied any abuse, told him she felt safe, and denied telling anyone she had been abused.  Defense counsel questioned the victim about whether the defendant

had a rule that she was not permitted to have boyfriends. The victim first stated that the defendant did not allow her to have boyfriends. She later testified that the defendant did not have a rule precluding her from dating. The victim acknowledged that she had spoken with the defendant on the phone while he was incarcerated and awaiting trial. The victim testified that she was scared of the defendant and did not want him to return home.

¶ 14    On redirect examination, the State elicited testimony from the victim that she loved the defendant, all her experiences with him were not bad, she had good times with him too, she spoke with him on the phone while he was in jail because she did not know she was not supposed to speak with him, and that she spoke with him because he was her father. The State also elicited that the victim had never been in serious trouble and was only ever grounded for a day or two. The victim testified that she did not make up the present allegations because the defendant had rules that she did not like or because the defendant did not want her dating anyone. The victim testified that she told Ponius that nothing happened because she was scared for her mother and her mother told her not to say anything.

¶ 15    The victim's mother testified that the victim and Hall are her daughters and she was married to the defendant. They were married in 2001. In September 2018 she had a conversation with the victim concerning the allegations in this case. She told the victim that she would find a way to get them out of the situation but that she did not want to involve DCFS. Her plan was to file for divorce and then go to the police. She also changed her work schedule from third to second shift. She testified that she did not want to go to the police right away or involve DCFS because she did not want to lose her children.

¶ 16    The victim's mother further testified that at some point Hall ran away from home. After they found her and she returned home, Hall told her about the incident with the defendant. This

was before the police became involved. The victim's mother acknowledged that she had spoken with the defendant on the phone while he was incarcerated. She testified that the victim did not talk to the defendant on the phone while incarcerated.

¶ 17    The defense called no witnesses but introduced letters from the victim to the defendant while he was in jail and phone recordings of two phone calls. These were admitted into evidence. The two recorded phone calls between the victim and the defendant, that occurred on March 16 and 20, 2019, were played in court. The letters and phone calls were very loving and gave no indication of the victim having been abused. In the letters, the victim stated that she loved the defendant and could not wait for him to come home. Following closing argument, the jury found the defendant guilty on both counts.

¶ 18    On October 18, 2019, the defendant filed a *pro se* posttrial motion arguing, in relevant part, that counsel was ineffective in that she did not "fulfill [her] duty to investigate potential sources of mitigating evidence based upon sound strategic reason: Dawnee Pulliam."

¶ 19    On the same day, the trial court conducted a preliminary inquiry into the defendant's *pro se* claim of ineffective assistance of counsel pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), and its progeny. A public defender was present with the defendant at the hearing, but it was not the public defender that represented the defendant at his trial. The defendant's trial counsel no longer worked in the public defender's office.

¶ 20    The trial court asked the defendant to explain the allegation, related to his niece, Dawnee Pulliam. The defendant said that the defense strategy was to "prove that there were lies being told," and Dawnee could "attest to those lies." The defendant stated that Dawnee could have testified that the victim had animosity toward him and lied about the allegations. The defendant said that he told defense counsel about Dawnee's potential testimony but that defense counsel told

him "she wasn't going to go over there and investigate that. She said it has, it, it wasn't along the lines of her strategy or how she put it." The defendant acknowledged that Dawnee had not given any written statements to the police or to defense counsel.

¶ 21 The trial court then asked the defendant what Dawnee's testimony would have been. The defendant said that Dawnee would have testified that the victim was not telling the truth. The trial court asked how Dawnee knew that the victim was lying. The defendant stated that "the reason she lied was because she was caught doing something she wasn't supposed to do, and Dawnee caught her doing it." When the trial court asked what the victim was caught doing, the defendant stated that "this whole situation is surrounded about a boy and not obeying what she was supposed to do." The trial court noted that Dawnee was not on the witness list and that the defendant was present when they reviewed the witness list in court. The defendant said that he told defense counsel that he wanted Dawnee on the witness list but she never added her. The trial court questioned posttrial defense counsel, who was present at the hearing. Posttrial defense counsel said she was not involved in the case until the day of trial. She was not aware of any discussions concerning calling Dawnee as a possible witness.

¶ 22 In denying the defendant's *pro se* motion, the trial court noted that the defendant alleged that Dawnee would have testified that the victim had a motive for not being truthful. The trial court reasoned:

> "THE COURT: The fact that [Dawnee] was not on a witness list and the fact that [the defendant] tells the Court today that her name was made available or proffered to [defense counsel] at some point before the trial and did not appear on a witness list, is an indication that [defense counsel] did not believe the testimony would either be helpful to the defense or would be subject to an examination that [defense counsel] did not believe

would be helpful to [the defendant's] defense of his case. I'm not speculating on what anybody was thinking. What I know is that the witness was not on the witness list. What I know is that [the defendant] says that he told [defense counsel] the witness should have been on the witness list. [The defendant] has indicated what he believes the subject in general of [Dawnee's] testimony would have been and that his attorney refused to or did not call the witness. Again, that's an issue of trial strategy."

The trial court concluded that, because the failure to call Dawnee was a matter of trial strategy, it could not support a claim of ineffective assistance of counsel. The trial court thus declined to appoint counsel to represent the defendant at a full *Krankel* hearing.

¶ 23    Following a sentencing hearing, the defendant was sentenced to a prison term of 23 years and 3 months for predatory criminal sexual assault and 3 years for aggravated criminal sexual abuse, to be served consecutively. The trial court also imposed a three-year term of mandatory supervised released (MSR) for predatory criminal sexual assault, a two-year term of MSR for aggravated criminal sexual abuse, and a lifetime sex-offender registration. Thereafter, the defendant filed a timely notice of appeal.

¶ 24                                    II. ANALYSIS

¶ 25    On appeal, the defendant argues that he is entitled to a new trial because trial counsel provided ineffective assistance by eliciting testimony on cross-examination from Hall and the victim that affirmatively helped the State prove its case. Alternatively, the defendant argues that the trial court erred in not appointing counsel to represent him at a full *Krankel* hearing on his *pro se* posttrial claim of ineffective assistance of counsel.

¶ 26    We first address the defendant's argument that defense counsel was ineffective in cross-examining Hall and the victim. To succeed on a claim of ineffective assistance of counsel, a

defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). In addition, a defendant must establish prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id.* A defendant must satisfy both components of the *Strickland* test, and the failure to establish either prong is fatal to claim of ineffective assistance. *Id.* at 687. The decision of whether and how to conduct a cross-examination is generally a matter of trial strategy, which cannot support a claim of ineffective assistance of counsel. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 34. If a claim may be resolved on the basis that there is no prejudice, a reviewing court need not consider if counsel's performance was deficient. *People v. Gaciarz*, 2017 IL App (2d) 161102, ¶ 50 (courts may resolve ineffectiveness claims by reaching only the prejudice component of *Strickland*, because lack of prejudice renders counsel's performance irrelevant).

¶ 27 As to Hall, the defendant argues that defense counsel was ineffective when she elicited testimony that Hall moved in with her father because of what happened with the defendant. Specifically, defense counsel elicited as follows from Hall on cross-examination:

"Q. [Defense Counsel:] Did you move back to Chicago because of what happened with your dad?

A. My dad --

Q. With [the defendant]. I apologize.

A. Yeah.

Q. You said that before you went to Chicago you moved to Roscoe, correct?

A. No, I didn't move there. I went there temporarily for a couple of weeks.

Q. And you said it was because they didn't want you to stay in the house?

A. The DCFS people that were involved in the case.

Q. So DCFS became involved?

A. Yes."

The defendant argues that this testimony was harmful because it reinforced that DCFS believed Hall's allegations enough that it wanted her removed from the defendant's house.

¶ 28    This allegation does not establish ineffective assistance of counsel because the cross-examination of Hall was not prejudicial. On direct examination, Hall testified that "they" did not want her to live at home with the defendant. It was unclear whether "they" meant the police or her father and grandfather. It was clear, however, that the police and/or her father found her allegations to be credible. The fact that it came out on cross-examination that DCFS was involved is immaterial because if the police were involved then DCFS was also necessarily involved as law enforcement officers are mandated reporters. That "DCFS" may not have wanted her to live in the same house as the defendant was no more prejudicial than the "police" or her father not wanting her to move back home. Accordingly, the defendant cannot establish prejudice because we cannot say that the result of the proceeding would have been different had the DCFS testimony not come out on cross-examination.

¶ 29    Further, the defendant cannot establish that defense counsel's cross-examination fell below an objective standard of reasonableness. After defense counsel elicited that DCFS became involved in the case, defense counsel also elicited testimony that Hall's mother did not lose custody of Hall, that Hall wanted to go live with her father, and that the incident between Hall and the defendant never proceeded to court. Accordingly, defense counsel's cross-examination of Hall also showed that the police never pursued charges against the defendant and that Hall had motive

to lie, as she wanted to go live with her father. As such, the defendant has not established that the cross-examination of Hall fell outside the bounds of reasonable representation. *People v. McDonald*, 2021 IL App (1st) 190687, ¶ 30 (a defendant is entitled to competent and reasonable, not perfect, representation).

¶ 30    The defendant also argues that defense counsel was ineffective in her cross-examination of the victim. The defendant points to the following exchange between defense counsel and the victim:

> "Q. [Defense counsel:] Does your dad let you have boyfriends?
>
> A. No.
>
> Q. Is that another rule you would say?
>
> A. I guess you can say that.
>
> Q. Does your dad like that you had a boyfriend?
>
> A. No.
>
> Q. Your boyfriend was DeShawn *** correct?
>
> A. Yes.
>
> Q. And your dad had met him before?
>
> A. Yes.
>
> Q. Did your dad tell you that you weren't allowed to date him?
>
> A. No.
>
> Q. But you knew it was a rule that you weren't allowed to; is that right?
>
> A. No.
>
> Q. Is it true that you weren't allowed to date anyone?
>
> A. No.

Q. Okay."

The defendant argues that, by eliciting testimony that the victim could have a boyfriend, defense counsel closed the door on any argument that the victim was lying because she was angry for being punished for having a boyfriend. The defendant further argues that the State took advantage of this on redirect examination by eliciting testimony from the victim that she did not fabricate the allegations because the defendant had rules or because he did not like her dating anyone.

¶ 31 This argument is also without merit as the defendant cannot establish prejudice. The complained-of cross-examination of the victim regarding whether she was allowed to have boyfriends was inherently contradictory. The victim first testified on cross-examination that it was a rule that she was not allowed to have boyfriends. However, a few questions later, she testified that there was no rule that she was not allowed to have boyfriends and that she was allowed to date. This line of questioning actually cast doubt on the victim's credibility, which supported the defense strategy that the victim was fabricating the allegations. We acknowledge that, on redirect examination, the State elicited testimony from the victim that she was not fabricating the allegations because the defendant made onerous rules or was preventing her from dating anyone. However, the State pursued this redirect examination because the cross-examination had implicated the victim's credibility.

¶ 32 Finally, the defendant argues that the cross-examination of the victim became more harmful when defense counsel preemptively impeached the letters and exhibits introduced into evidence to suggest that the victim and the defendant had a loving father-daughter relationship. Specifically, defense counsel asked the victim on cross-examination:

"Q. [Defense counsel:] Are you scared of your dad?

A. Yes.

Q. Do you want him to come home and live with you?

A. No."

The defendant argues that defense counsel undercut the evidence from the letters and phone calls by eliciting testimony that the victim did not want the defendant to come home. The defendant further argues that the State "made the most of this gift from defense counsel" by eliciting testimony from the victim on redirect examination that she still loves the defendant, that not all of her experiences with him were bad, and she spoke with him on the phone while he was in jail because the defendant was still her father.

¶ 33 The complained of cross-examination does not establish ineffective assistance of counsel as defense counsel used this testimony to attack the victim's credibility. While the victim testified on cross-examination that she was afraid of her father and did not want him to come back home, the letters and phone calls admitted into evidence indicated that the victim was "counting the days" and looking forward to when the defendant could finally return home. In closing argument, defense counsel discussed the letters and phone calls in detail, arguing that content showed that they were between a loving father and daughter and not between an abuser and his victim. Defense counsel argued that the victim's testimony that she was afraid of her father was at direct odds with the letters and phone calls and that this cast doubt on her credibility. Accordingly, the cross-examination of the victim was not unreasonable or prejudicial.

¶ 34 We are unpersuaded by the defendant's reliance on *People v. Lee*, 185 Ill. App. 3d 420 (1989), and *People v. Orta*, 361 Ill. App. 3d 342 (2005). In *Lee*, defense counsel committed a multitude of unprofessional errors. Specifically, he elicited the most damaging testimony from the defendant's accomplice detailing how the accomplice helped the defendant commit the crime (*id.* at 441-442); "repeatedly obtained an answer helpful to his client's case and then *led* the witness

to recant the helpful answer" (Emphasis in original) (*id.*); failed to properly investigate the prior mental deficiencies of the accomplice or request a hearing on his competency (*id.* at 435-37); failed to make a meaningful opening statement (*id.* at 445); and failed to prepare the defendant before calling her to testify (*id.* at 446). The repeated substandard performance of counsel in *Lee* is not close to the alleged ineffective assistance in this case, which was limited to alleged errors on cross-examination and, unlike in *Lee*, did not elicit the most damaging testimony. In the present case, the most damaging testimony was provided by the victim and Hall on direct examination.

¶ 35    In *Orta*, the defendant was charged with possession of a controlled substance with intent to deliver. *Orta*, 361 Ill. App. 3d at 346. On cross-examination, defense counsel elicited testimony from two police officers that they had conducted a drug deal with the defendant the day before the offense at issue and that the defendant had prerecorded funds in his possession from the prior day's drug sale. *Id.* at 344-45. In finding the defendant guilty, the trial court stated that the prerecorded funds could be evidence that someone in the possession of drugs was in the business of delivering drugs. *Id.* at 350. The reviewing court held that eliciting testimony about the prerecorded funds was ineffective assistance because defense counsel had essentially established that the defendant was in the business of selling drugs and the trial court at least partially relied on that evidence in finding the defendant guilty. *Id.* In the present case, unlike in *Orta*, defense counsel's cross-examination had not established an essential element of the State's case. As noted, those elements were established by the victim's and Hall's testimony on direct examination.

¶ 36    The defendant's next contention on appeal is that the trial court erred in denying his *pro se* posttrial claim that defense counsel was ineffective in failing to call Dawnee to testify at trial. The defendant argues that the matter should be remanded for the appointment of counsel and further posttrial proceedings.

¶ 37    *Pro se* posttrial claims alleging ineffective assistance of counsel are governed by the common-law procedure that has developed from our supreme court's decision in *Krankel*. *People v. Jackson*, 2020 IL 124112, ¶ 95.   *Krankel* is triggered whenever a defendant raises a *pro se* posttrial claim of ineffective assistance of counsel.  *People v. Jolly*, 2014 IL 117142, ¶ 29.  After a defendant raises such a claim, the trial court must employ a two-step procedure.  *Jackson*, 2020 IL 124112, ¶ 97.   First, the trial court conducts a preliminary *Krankel* inquiry, which is an examination of the factual basis underlying the defendant's claim.  *Id.*  During this preliminary evaluation, the trial court is permitted to question defense counsel about the facts and circumstances surrounding the defendant's allegations, engage in a discussion with the defendant, or rely on its own knowledge of counsel's performance at trial and the insufficiency of the defendant's allegations.  *People v. Ayres*, 2017 IL 120071, ¶ 12.  If, during this preliminary inquiry, the trial court determines that the defendant's claim lacks merit or pertains only to matters of trial strategy, the trial court may deny the *pro se* motion.  *Id.* ¶ 11.  A claim lacks merit if it is conclusory, misleading, or legally immaterial, or does not bring to the trial court's attention a colorable claim of ineffective assistance of counsel.  *People v. Robinson*, 2015 IL App (1st) 130837, ¶ 71.

¶ 38    If, however, the trial court finds that the allegations demonstrate "possible neglect of the case," new counsel (*i.e., Krankel* counsel) must be appointed to represent the defendant at an adversarial and evidentiary hearing on the defendant's claims.  *Ayres*, 2017 IL 120071, ¶ 11.  The appointment of new counsel avoids any conflict of interest that might arise if trial counsel was forced to justify his or her actions contrary to the defendant's position.  *Jackson*, 2020 IL 124112, ¶ 97.

¶ 39    The applicable standard of review depends on whether the trial court addressed the merits of the defendant's *pro se* posttrial claim of ineffective assistance of counsel.  *Id.* ¶ 98.  The

operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance. *Id.* Accordingly, if the reviewing court is asked to determine whether the trial court properly conducted a *Krankel* inquiry, the standard of review is *de novo*. *Id.* If, on the other hand, after performing the *Krankel* inquiry the trial court reaches a determination as to the merits of the defendant's *pro se* ineffective assistance of counsel claim, the reviewing court may reverse only if the trial court's action was manifestly erroneous, *i.e.,* the error was clearly evident, plain, and indisputable. *Id.* In the present case, the trial court conducted a preliminary *Krankel* hearing and denied the defendant's *pro se* claim of ineffective assistance of counsel. Accordingly, the trial court ruled on the merits of the defendant's *pro se* claim, and we review the trial court's determination for manifest error.

¶ 40 Here, manifest error occurred when the trial court found that the defendant did not show possible neglect of his case regarding the alleged failure to investigate Dawnee's potential testimony. Following the preliminary *Krankel* inquiry, it was not clear that this claim lacked merit or that defense counsel's inaction was the result of sound trial strategy. "When conducting the [preliminary] inquiry, some interchange between the court and trial counsel regarding the defendant's claims is permissible and usually necessary in determining whether to appoint counsel." *People v. Smith*, 2021 IL App (1st) 190421, ¶ 97. In this case, the trial court did not have the opportunity to question defense counsel because she no longer worked as a public defender. As such, defense counsel was not present at the inquiry to explain whether or not she investigated Dawnee and, if so, why she did not call her to testify at trial. Because defense counsel was not present, the defendant's allegations, that defense counsel failed to investigate Dawnee and that Dawnee would have provided testimony that the victim had a motive to lie, were unrebutted. It is well settled that an attorney who fails to conduct reasonable investigation, fails to interview

witnesses, and fails to subpoena witnesses cannot be found to have made decisions based on valid trial strategy. *People v. Coleman*, 267 Ill. App. 3d 895, 899 (1994). Accordingly, the trial court's conclusion, following preliminary inquiry, that the failure to call Dawnee was a matter of trial strategy is manifestly erroneous. Because the defendant has shown possible neglect of the case, remand is required for the appointment of counsel and further posttrial proceedings where perhaps the defendant's former defense counsel can be present to respond to the allegation at issue. See *People v. Alexander*, 2020 IL App (3d) 170829, ¶ 33 (remand for appointment of counsel where trial counsel failed to investigate a recorded phone call and defense counsel's statements at the preliminary inquiry did not demonstrate that the inaction was the result of trial strategy). As a result of our determination, we need not address the defendant's contention that the trial court improperly required him to provide a written statement from Dawnee.

¶ 41                                III. CONCLUSION

¶ 42    For the reasons stated, we affirm the defendant's conviction and sentence but we remand for the appointment of counsel and further proceedings on the defendant's *pro se* posttrial claim of ineffective assistance of counsel.

¶ 43    Affirmed in part and vacated in part; cause remanded.