2024 IL App (1st) 230122-U

No. 1-23-0122

Order filed October 16, 2024

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 21 CR 6402 |
| | ) | |
| BRANDON HARRIS, | ) | Honorable |
| | ) | Michael J. Kane, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court.
Justices Reyes and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction for aggravated unlawful use of a weapon over his contention that the State did not prove his knowing possession of a firearm because he was unconscious when it was recovered from underneath his thigh. Moreover, the statute under which defendant was convicted does not violate the second amendment.

¶ 2    Following a bench trial, defendant Brandon Harris was found guilty of two counts of aggravated unlawful use of a weapon (AUUW), and one count of unlawful use or possession of a weapon by a felon (UUWF). At sentencing, the trial court merged the guilty findings and imposed

a three-year prison term for AUUW under count I.[1] On appeal, defendant contends that the State failed to establish his knowing possession of a firearm beyond a reasonable doubt because he was unconscious when it was recovered from under his thigh. He further contends that the AUUW statute violates the second amendment under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). We affirm.[2]

¶ 3    Defendant was charged by indictment with two counts of AUUW and one count of UUWF following a February 27, 2021, incident. Relevant here, count I for AUUW alleged that defendant knowingly carried on or about his person a firearm that was uncased, loaded, and immediately accessible and that he had not been issued a concealed carry license (CCL) at the time of the offense. See 720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5) (West 2020).

¶ 4    At trial, Chicago police officer Anderson testified that, around 1:30 a.m. on February 27, 2021, a group waved down her squad car and related that a vehicle, containing two unconscious people, was stopped in a traffic lane.[3] The group further stated that a female passenger appeared as though she had been beaten. Anderson relocated to the vehicle and observed an unconscious man, whom she identified in court as defendant, in the driver's seat and an unconscious woman in the front passenger seat. She did not remember if the vehicle was running. When a paramedic opened the front driver's side door, Anderson, who was positioned at the rear driver's side door,

---

[1]In its brief, the State asserts that the trial court imposed a sentence on count III for UUWF. However, at sentencing, the trial court stated that its guilty findings merged into count I (AUUW) and imposed sentence on count I. Moreover, the mittimus reflects that sentence was imposed on count I for AUUW, and counts II and III, for AUUW and UUWF, respectively, merged into count I.

[2]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[3]The report of proceedings does not contain Officer Anderson's given name.

observed the butt of a firearm "sticking *** from underneath" defendant's thigh. Anderson recovered the firearm, which was loaded.

¶ 5     When the paramedics could not wake defendant and the female passenger, Narcan was administered and both became alert. After defendant exited the vehicle, Anderson asked whether he had a valid Firearm Owners Identification (FOID) card or CCL, and learned that he did not. Following a "LEADS inquiry," Anderson learned that defendant did not possess a valid FOID card or CCL, and that his driver's license was revoked. Later, at a police station, Anderson learned that defendant had a prior felony conviction.

¶ 6     During a conversation, defendant explained that the female passenger called him and asked him to sit with her in the vehicle because it was disabled, she was waiting for a tow truck, and she was scared. Anderson observed damage to the vehicle's front right tire and opined that an axle may have been broken. She also observed injuries and blood on the female passenger's face. The passenger gave her name, and a search revealed that the vehicle was registered to her.

¶ 7     Anderson wore a body camera and testified that its footage truly and accurately depicted the events of February 27, 2021. The State entered the footage into evidence. The footage, which was published, is included in the record on appeal and this court has viewed it.

¶ 8     In the footage, Anderson approaches a vehicle that has flashing hazard lights. A paramedic opens the front driver's side door. A man is seated in the driver's seat with his head turned toward the door. Anderson points her flashlight at the back driver's side window. When Anderson turns back to the open driver's side door, she says, "ah, hold on" and reaches around the paramedic into the vehicle. At this point, a small portion of the butt of a firearm is visible under the man's thigh. Anderson removes the firearm, walks to the passenger side of the vehicle, and sees a person inside.

Anderson's partner helps her to put on gloves. Then, the sounds of a firearm being cleared are heard and Anderson picks up a bullet. Anderson's partner asks where she found the firearm, and she replies, "under his thigh."

¶ 9 During cross-examination, Anderson did not recall whether defendant reached to his left upon regaining consciousness. Anderson further testified that the female passenger only gave a first name and refused to spell it, and then stopped answering questions. Anderson did not know if the firearm was submitted for fingerprints or DNA testing.

¶ 10 During questioning by the trial court, Anderson testified that the firearm was black, semi-automatic, and loaded. Defendant was unconscious when she removed the firearm.

¶ 11 The parties entered a stipulation that defendant did not have a valid FOID card or CCL on February 27, 2021. The State entered into evidence a certified copy of defendant's prior conviction for driving with a revoked or suspended driver's license in case number 14 C 66027801.

¶ 12 The defense presented Shannan Sarpy, who testified that on February 27, 2021, she was driving, hit a pothole, and was unable to pull over or steer her vehicle. She called defendant because he lived in the area. When defendant arrived, he examined her vehicle and stated that the axle was broken. Sarpy called for a tow truck and was told it would take an "hour or so." At this point, Sarpy was in the front passenger seat and defendant was in the driver's seat. Defendant fell asleep and Sarpy was unable to wake him. She called the tow truck driver again.

¶ 13 Sarpy owned a firearm and at that time had a valid FOID card and CCL. At trial, she identified copies of these documents, as well as the receipt for her .45-caliber semi-automatic firearm. She never told defendant that she owned a firearm and did not show or give it to him that day. Rather, it was locked in the vehicle's glove box.

¶ 14    Once defendant fell asleep, Sarpy became uncomfortable when she saw "guys walking down the street," so she retrieved the firearm and put it in her hoody pocket. However, because the pocket was "pretty shallow," the firearm stuck out "a little bit." Sarpy then exited the vehicle and went to the driver's side to wake defendant. The firearm slipped out of her pocket, so she put it on the seat. There was room on the seat because defendant was in the "fetal position" leaning toward the passenger seat. When Sarpy could not wake defendant, she went back to the passenger side and sat down. She called the tow truck driver another time, tried to wake defendant, and then fell asleep. She was woken by a paramedic.

¶ 15    During cross-examination, Sarpy testified that she was unfamiliar with the area, but knew that defendant lived nearby. When defendant arrived, he asked her to move to the passenger seat and fell asleep after 20 to 30 minutes. She took her firearm out because she felt unsafe. When she tried to wake defendant, her firearm was "slipping," so she set it down and continued trying to wake defendant. She returned to the passenger seat because she was cold and afraid. Sarpy was "a little concerned" about defendant, but assumed he was tired. When the paramedics woke her, the vehicle door was open. She was unsure how the paramedics accessed the vehicle because she locked the doors.

¶ 16    By the time Sarpy explained to officers that the firearm belonged to her, defendant was in handcuffs. When she asked why defendant was going to jail, she was told that it did not matter who owned the firearm because he was already cuffed. Sarpy did not "know" defendant to "do drugs." She was injured when she hit her head in a friend's bathroom earlier that evening.

¶ 17    During examination by the court, Sarpy asserted that she did not "do drugs" and did not know anything about defendant doing drugs. She "just sat" her firearm near defendant. She asserted that she cooperated with police to the best of her ability, but felt "dazed."

¶ 18    In finding defendant guilty of two counts of AUUW and one count of UUWF, the trial court found that Sarpy may have owned the firearm but that the issue was who possessed it. The court found Sarpy's testimony made "no sense" because, if she retrieved the firearm due to fear, she would have kept it in her hands "all the time" rather than leaving it under defendant's leg.

¶ 19    Defendant filed a motion for a new trial alleging, relevant here, that he was not proven guilty beyond a reasonable doubt. At the hearing on the motion, defense counsel argued that there was no testimony that defendant held or had knowledge of the firearm; rather, he was unconscious when it was recovered. In denying defendant a new trial, the trial court found Anderson's testimony to be consistent with the body camera footage, which depicted where the firearm was found under defendant. Further, the court did not believe "a word" that Sarpy said.

¶ 20    Defendant's presentence investigation (PSI) report listed, in pertinent part, 14 prior convictions for driving on a revoked or suspended license, 6 prior convictions for ID theft, 4 prior convictions for aggravated ID theft, one prior conviction for driving under the influence, and one prior conviction for battery and resisting/obstructing a peace officer.[4] Following argument, the trial court merged the guilty findings on counts II (AUUW) and III (UUWF) into count I and imposed a three-year prison term for AUUW under count I.

¶ 21    On appeal, defendant first contends that he was not proven guilty beyond a reasonable doubt of AUUW because the State failed to establish that he knowingly possessed the firearm

[4]The PSI lists the offense as "BATT CAU BOD HARM RESIST/OBS—PEA O."

recovered from the vehicle where he was discovered unconscious. Defendant notes that no one testified that he possessed the firearm and that neither the vehicle nor the firearm belonged to him.

¶ 22    In reviewing the sufficiency of the evidence, "the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard applies whether the evidence is direct or circumstantial and does not allow this court to substitute its judgment for that of the fact finder on issues involving witness credibility and the weight of the evidence. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). This court will not retry a defendant, and on review, we must draw all reasonable inferences from the evidence in favor of the State. *People v. Jones*, 2023 IL 127810, ¶ 28. Further, a reviewing court may affirm on any grounds supported by the record. *People v. Smith*, 2021 IL App (1st) 190421, ¶ 90; see also *People v. Daniel*, 2013 IL App (1st) 111876, ¶ 37 ("we may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct").

¶ 23    In a bench trial, the trial court is responsible for determining the credibility of the witnesses, weighing the evidence, resolving conflicts in the evidence, and drawing reasonable inferences therefrom. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). When weighing the evidence, the trial court is not required to disregard the inferences that flow naturally from that evidence; nor must it search for any possible explanation consistent with innocence and raise it to the level of reasonable doubt. *Jackson*, 232 Ill. 2d at 281. Ultimately, we reverse a defendant's conviction based upon insufficient evidence only when the evidence is so unreasonable, improbable, or unsatisfactory that there is reasonable doubt as to his guilt. *Jones*, 2023 IL 127810, ¶ 28.

¶ 24    To sustain a conviction for AUUW as charged in count I of the indictment, the State had to establish beyond a reasonable doubt that defendant knowingly carried on or about his person a firearm that was uncased, loaded, and immediately accessible and that he had not been issued a CCL at the time of the offense. See 720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5) (West 2020). Here, defendant contends that the State failed to establish his knowledge and control of the firearm.

¶ 25    Possession of a firearm may be actual or constructive. *Jones*, 2023 IL 127810, ¶ 30. Actual possession need not be demonstrated if constructive possession can be inferred. *Daley v. El Flanboyan Corp.*, 321 Ill. App. 3d 68, 75 (2001).

¶ 26    Constructive possession exists where a defendant had knowledge of the presence of the firearm and exercised immediate and exclusive control over the location where it was found. *Id*. Control is established when a defendant has the capability and intent to maintain dominion and control over contraband. *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 17. Proof that a defendant had control over the location where contraband was found gives rise to an inference of his knowledge and possession of it. *Jones*, 2023 IL 127810, ¶ 30. Knowledge may be demonstrated by evidence of a defendant's declarations, acts, or conduct from which one can infer that he knew the contraband existed in the place where it was found. *Spencer*, 2012 IL App (1st) 102094, ¶ 17. A defendant's proximity to contraband is another factor courts have found relevant when determining constructive possession. *People v. Wise*, 2021 IL 125392, ¶ 29.

¶ 27    Knowledge and possession are questions of fact. *People v. Loggins*, 2019 IL App (1st) 160482, ¶ 45. When determining whether constructive possession has been established, a trier of fact is entitled to rely on reasonable inferences of knowledge and possession, absent other factors that might raise a reasonable doubt of a defendant's guilt. *Spencer*, 2012 IL App (1st) 102094,

¶ 17. Constructive possession is often established by entirely circumstantial evidence. *People v. McCarter*, 339 Ill. App. 3d 876, 879 (2003).

¶ 28    Viewing the evidence in the light most favorable to the State, we find that a rational trier of fact could have concluded that defendant, at a minimum, constructively possessed the firearm recovered by Anderson. Here, police officers and paramedics found defendant unconscious in the driver's seat of a vehicle and a loaded firearm was recovered from underneath his thigh. The firearm was positioned between the driver's seat cushion and defendant's leg such that only a small portion of the butt was visible. Given that the firearm was hidden under defendant's thigh and within his immediate reach, the trier of fact could reasonably infer that it was in his immediate dominion and control, giving rise to an inference of his knowledge and possession of it. *Jones*, 2023 IL 127810, ¶ 30.

¶ 29    Although the firearm was registered to Sarpy and she was present in the vehicle, those facts were not fatal to the State's case, as indicia of joint access do not negate a defendant's constructive possession of contraband. See *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 27 (another person's access to the contraband does not diminish constructive possession); see also *People v. Maldonado*, 2015 IL App (1st) 131874, ¶ 43 (constructive possession can be established when there is joint possession or others have access to the area). While defendant was unconscious when the firearm was recovered, his knowledge of the firearm before losing consciousness can be reasonably inferred from the fact that it was wedged underneath his thigh such that only a small portion of the butt was visible. See *People v. Givens*, 237 Ill. 2d 311, 335 (2010) ("where possession has been shown, an inference of culpable knowledge can be drawn from the surrounding facts and circumstances").

¶ 30    Nevertheless, defendant argues that the State's failure to provide a witness who observed him possess the firearm and physical evidence linking him to it were fatal to its case.

¶ 31    Contrary to defendant's position, Anderson's testimony describing the placement of the firearm and body camera footage depicting the firearm's location sufficiently linked defendant to it. See *People v. Campbell*, 2019 IL App (1st) 161640, ¶ 33 ("if witnesses' testimony is otherwise credible, the State [is] not required to present additional physical evidence" linking the defendant to contraband (internal quotation marks omitted)). Moreover, while Sarpy testified that she left the firearm on the driver's side seat while trying to wake defendant, the trial court found her testimony incredible, noting that a person who retrieved a firearm due to fear would presumably retain it. See *People v. Jacobs*, 2016 IL App (1st) 133881, ¶ 53 (a trier of fact is not "required to accept the defendant's version of the facts"). A trier of fact need not disregard inferences which flow normally from the evidence or seek all possible explanations consistent with innocence and raise them to the level of reasonable doubt. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60.

¶ 32    In the case at bar, a rational trier of fact could have found defendant constructively possessed the firearm based upon Anderson's testimony and the body camera footage establishing it was wedged under defendant's thigh such that only the butt was visible. Ultimately, we reverse a defendant's conviction only when the evidence is so unreasonable, improbable, or unsatisfactory that reasonable doubt of his guilt remains (*Jones*, 2023 IL 127810, ¶ 28); this is not one of those cases. We therefore affirm defendant's conviction for AUUW.

¶ 33    Defendant next contends, for the first time on appeal, that his AUUW conviction violates the second amendment under *Bruen*.

¶ 34    A defendant raising a constitutional challenge to a statute carries the heavy burden to rebut the strong judicial presumption that the challenged statute is constitutional. *People v. Rizzo*, 2016 IL 118599, ¶ 23. To overcome this presumption, the defendant must clearly establish that the statute violates the constitution. *Id.* However, courts have a duty to uphold the constitutionality of a statute whenever reasonably possible, resolving doubts in favor of its validity. *Id.* Whether a statute is constitutional is a matter of law that we review *de novo*. *Id.*

¶ 35    A constitutional challenge to a statute may be facial or as-applied. *Id.* ¶ 24. A facial challenge requires the challenging party to show that the statute is unconstitutional under any set of facts, whereas an as-applied challenge depends on the particular facts and circumstances of an individual case. *Id.*

¶ 36    A defendant may challenge the facial constitutionality of a statute at any time, even, as in this case, for the first time on appeal. *People v. Thompson*, 2015 IL 118151, ¶ 32. A facially unconstitutional statute is void *ab initio*, meaning that "the statute was constitutionally infirm from the moment of its enactment and, therefore, unenforceable." *Id*. However, a defendant raising a facial challenge has a particularly heavy burden, as the fact that the statute might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid. *Rizzo*, 2016 IL 118599, ¶ 24.

¶ 37    Pursuant to the second amendment, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. The United States Supreme Court has "recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun" inside and outside the home "for self-defense." *Bruen*, 597 U.S. at 8-9; see also *District of*

*Columbia v. Heller*, 554 U.S. 570, 595 (2008) (second amendment confers an individual right to keep and bear arms); *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010) (second amendment applies to the states).

¶ 38    Recently, in *Bruen*, the Supreme Court announced a new framework for assessing the constitutional validity of laws seeking to regulate conduct protected by the second amendment. The Court explained that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17. In order to justify regulation of this protected conduct, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Accordingly, "[o]nly if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." (Internal quotation marks omitted.) *Id.*

¶ 39    In *Bruen*, the Court concluded that a firearm licensing system that required individuals to show a "special need for self-defense" in order to carry a firearm in public violated citizens' right to bear arms. *Id.* at 11, 71. The Court explained that there was no showing that the firearm licensing regime was supported by "an American tradition justifying" it. *Id.* at 70-71.

¶ 40    Defendant relies on *Bruen* to first argue that the AUUW statute is facially unconstitutional because it imposes an "onerous dual-licensing regime" that requires a person to obtain a FOID card and then obtain a CCL. He asserts that there is no "historical tradition" of imposing criminal punishment on a person who exercises the constitutional right to bear arms in a vehicle without possession of a FOID card and CCL. Defendant further posits that the right to carry a firearm for self-defense is "immediate" whereas there is a delay in the issuance of FOID cards and CCLs.

¶ 41    The FOID Card Act requires a person to obtain a FOID card before legally possessing firearms or ammunition. 430 ILCS 65/2(a) (West 2020). The Firearm Concealed Carry Act (Concealed Carry Act) requires a person to obtain a CCL prior to lawfully carrying a concealed firearm on his or her person. 430 ILCS 66/10 (West 2020). Moreover, in order to be issued a CCL, an applicant must possess a "currently valid" FOID card, meet the requirements for the issuance of a FOID card at the time of application, and not be prohibited under the FOID Card Act or federal law from possessing or receiving a firearm. See 430 ILCS 66/25(2) (West 2020).

¶ 42    As the *Bruen* court noted, "[t]hroughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Bruen*, 597 U.S. at 38.

¶ 43    Thus, the issue is not whether the second amendment protects carrying a firearm without a license but whether the licensing requirement is consistent with this nation's history of regulating that right. See *id.* at 17 ("[o]nly if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command" (internal quotation marks omitted)).

¶ 44    In *Bruen*, the Supreme Court recognized Illinois as a " 'shall issue' jurisdiction[], where authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." See *id.* at 13 n.1. The Court noted that "nothing in our analysis should be interpreted to suggest the unconstitutionality of [these] 'shall-issue' licensing regimes." *Id.* at 38 n.9. The Court explained:

"Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right *** [rather] these shall-issue regimes *** are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.' " *Id.* (quoting *Heller*, 554 U.S. at 635).

¶ 45     Recently, in *People v. Gunn*, 2023 IL App (1st) 221032, this court rejected an argument similar to defendant's. There, the defendant was convicted of AUUW for possessing a weapon without a valid FOID card or CCL. *Id.* ¶ 5. On appeal, he argued that his AUUW conviction should be reversed because the FOID Card Act's requirements that an applicant pay a fee and provide personal information were "an impermissible barrier" to one's exercise of second amendment rights and that the FOID Card Act was inconsistent with this nation's historical tradition of firearm regulation. *Id.* ¶ 17. He further asserted that the Concealed Carry Act's requirements that an individual possess a valid FOID card, undergo a 16-hour firearms training course, and adhere to a 90-day waiting period before a CCL was issued did "not comport with our nation's historic tradition of firearm regulation." *Id.* ¶ 25.

¶ 46     In that case, we concluded that neither statutory scheme violated the second amendment. *Id.* ¶ 32. Regarding the FOID Card Act, we noted that *Bruen* "explicitly acknowledged that background checks, which are the cornerstone of the FOID Card Act, are permissible." *Id.* ¶ 19. We further determined that there was "no need for us to engage in a historical analysis of firearm regulation when the Supreme Court has already done so and explicitly sanctioned the use of background checks." *Id.* As to the Concealed Carry Act, we reiterated that Illinois was a shall-

issue jurisdiction, which meant that "the State does not have any discretion to deny a CCL to an applicant who fulfills [the] objective criteria" for issuance of a CCL. *Id.* ¶ 22.

¶ 47     We therefore concluded that unlike the licensing process examined in *Bruen*, "the Illinois statute mandates issuance of FOID cards and CCLs within the framework of what has always been historically acceptable in the United States." *Id*. We noted that the Concealed Carry Act contained well-defined requirements like background checks and the completion of a firearms training course, both of which the *Bruen* court found acceptable, and which, if fulfilled, resulted in the issuance of a CCL. *Id.* ¶ 29. Accordingly, we held that the FOID Card Act and the Concealed Carry Act comply "with federal law and, consequently, the AUUW statute does as well." *Id.* ¶¶ 19, 30; accord *People v. Hatcher*, 2024 IL App (1st) 220455, ¶ 61 ("Illinois is what *Bruen* calls a 'shall-issue' state because the Illinois State Police *shall* issue a FOID card and a CCL to any applicant who meets the respective statutory criteria" (emphasis in original)).

¶ 48     In the case at bar, we follow the well-reasoned analysis of *Gunn*. We reject defendant's contention that the AUUW statute is unconstitutional on its face due to the statutory schemes for the issuance of a FOID card and a CCL when the *Bruen* court endorsed such regulations. See, *e.g.*, *People v. Kuykendoll*, 2023 IL App (1st) 221266-U, ¶ 25 ("Illinois employs the kind of shall-issue regime endorsed by the *Bruen* Court"); *People v. Smith*, 2023 IL App (4th) 220958-U, ¶¶ 16, 18, 22 ("the FOID card application process and the AUUW statute's FOID card requirement are distinguishable from the may-issue licensing regime challenged in *Bruen*").[5]

---

[5]Although nonprecedential, orders filed under Supreme Court Rule 23(b) on or after January 1, 2021, may be cited as persuasive authority. Ill. S. Ct. R. 23(b), (e)(1) (eff. Feb. 1, 2023).

¶ 49    Defendant finally argues that the AUUW statute is unconstitutional as applied to him. He notes that as a nonviolent felon he cannot obtain a CCL and, therefore, will never be able to comply with the AUUW statute. The State responds that, as a felon, defendant falls outside the protections of *Bruen* because the second amendment only protects law-abiding citizens.

¶ 50    Generally, a defendant must raise an as-applied constitutional challenge to a statute before the trial court in order to develop the record as it pertains to the specific facts and circumstances of his claim. *Thompson*, 2015 IL 118151, ¶ 37 (because "an as-applied constitutional challenge is dependent on the particular circumstances and facts of the individual defendant," it is "paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review"). However, our supreme court has held that when "[a]ll the facts and circumstances to decide the defendant's claim *** are already in the record" the claim may be raised and reviewed on appeal for the first time. *People v. Holman*, 2017 IL 120655, ¶¶ 29-32, *overruled on other grounds by People v. Wilson*, 2023 IL 127666, ¶ 42; *People v. Martin*, 2018 IL App (1st) 152249, ¶¶ 12-13 ("where the evidentiary record developed below is sufficient, the constitutionality of a statute may be challenged on appeal").

¶ 51    In the case at bar, defendant's as-applied challenge is based on facts already in the record, *i.e.*, his possession of a firearm without a FOID card or a CCL and his criminal history as listed in the PSI. Defendant's argument does not require factual development because it is based on caselaw, statutory authority, and the PSI. Moreover, defendant's contention on appeal is not dependent upon the underlying facts of his earlier convictions, but merely on their existence. That is, the question before us is whether it is constitutionally permissible to restrict a person from possessing a firearm where that person has been convicted of felonies that do not have a violent

act as one of their elements. Therefore, on the record before us, we conclude that defendant's claim is properly raised and that we may consider its merits. See *Martin*, 2018 IL App (1st) 152249, ¶¶ 12-13.

¶ 52 We note that although defendant characterizes himself as a nonviolent felon, he has a prior conviction for battery causing bodily harm and resisting/obstructing a peace officer. Notwithstanding, defendant focuses on his inability to obtain a CCL because of his prior nonviolent felony convictions. The State responds that defendant's conduct was not constitutionally protected because he is a felon and the second amendment protects only law-abiding citizens' possession of firearms.

¶ 53 The Illinois State Police has the authority to deny an application for a FOID card to a person convicted of a felony under the laws of Illinois or any other jurisdiction. See 430 ILCS 65/8(c) (West 2020). Moreover, the Illinois State Police shall issue a CCL when, relevant here, the applicant has a currently valid FOID card, meets the requirements for the issuance of a FOID card at the time of application, and is not prohibited under the FOID Card Act or federal laws from possessing or receiving a firearm. See 430 ILCS 66/25(2) (West 2020). In the case at bar, defendant's prior felony convictions bar him from obtaining a FOID card and, therefore, a CCL. See 430 ILCS 65/8(c) (West 2020) (the Illinois State Police has the authority to deny an application for a FOID card to a person convicted of a felony under the laws of Illinois or any other jurisdiction).

¶ 54 We reject defendant's as-applied challenge to the AUUW statute. We assume, without deciding, the conduct regulated by the AUUW statute falls under the protection of the second amendment. Nonetheless, defendant's argument fails under the *Bruen* framework because

statutory provisions limiting the right of felons to possess firearms are consistent with this country's historical tradition of firearm regulation.

¶ 55 In *Heller*, the Supreme Court stated that the second amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. The Court noted, however, that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 626. Moreover, as Justice Kavanaugh stated in his concurrence in *Bruen*, "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Bruen*, 597 U.S. at 80-81 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (quoting *Heller*, 554 U.S. at 636); see also *id.* at 72 (Alito, J., concurring) (*Bruen*'s holding does not "disturb[ ] anything that we said in *Heller* or *McDonald* *** about restrictions that may be imposed on the possession or carrying of guns").

¶ 56 We are unpersuaded by defendant's argument that, as a nonviolent felon, he falls outside the "felon" category. Firstly, defendant had a prior conviction for battery. Secondly, he cites no Supreme Court decision creating such a distinction. See *Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019) (noting that "[f]elonies encompass a wide variety of non-violent offenses, and we see no reason to think that the [*Heller*] Court meant 'dangerous individuals' when it used the word felon"); *People v. Echols*, 2024 IL App (2d) 220281-U, ¶¶ 155-56 (rejecting a distinction between violent felonies and felonies that do not have an element involving violence, as neither *Heller* nor *McDonald* qualified the term " 'felon' ").

¶ 57 Ultimately, defendant's claim fails under the *Bruen* framework, as this nation has a historical tradition of firearm regulation that excludes felons from possessing them. See *People v. Brooks*, 2023 IL App (1st) 200435, ¶¶ 90-105 (holding that historical records and Supreme Court

precedent provide historical underpinnings for the prohibition of firearm possession by previously-convicted felons, even if the convictions were for nonviolent felonies); *Awkerman v. Illinois State Police*, 2023 IL App (2d) 220434, ¶¶ 50-54 (concluding that restricting felons from possessing firearms is "consistent with this country's historical tradition of firearm regulation"). Accordingly, we reject defendant's as-applied challenge to the AUUW statute.

¶ 58    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 59    Affirmed.